STATE of South Dakota, Plaintiff and Appellee,

v.

Louis T. ARCHAMBEAU, Defendant and Appellant.

No. 13675.

Supreme Court of South Dakota.

Argued Oct. 14, 1982.

Decided April 27, 1983.

Douglas E. Kludt, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Larry A. Nelson of Minick, Nelson & McCulloch, Vermillion, for defendant and appellant.

WOLLMAN, Justice.

Defendant appeals from the judgment of conviction entered after he was found guilty by a jury of the crime of aggravated assault. SDCL 22–18–1.1. We affirm.*

In the shank of a drinking party that began during the evening of August 5, 1981, in and around a mobile home in Ver-

million, defendant and his son Kenneth Archambeau began betting ten dollars per toss in a coin flipping game in which the coin was flipped by Eugene Bruguier, one of the participants in the drinking party. Kenneth Archambeau became convinced that defendant was trying to cheat him, whereupon he and defendant became involved in a heated, abusive argument during which Kenneth apparently referred to a number of childhood grievances. The argument culminated in Kenneth's kicking defendant several times on the leg and attempting to kick him in the face in martial arts style. This argument, which occurred at approximately 7:00 a.m. on August 6, was overheard by several of the other occupants of the mobile home. After defendant failed to heed Kenneth's repeated requests to leave the mobile home, Jim Lee, one of the occupants of the mobile home, intervened and told defendant to "get the hell out," whereupon defendant left the home.

Defendant and Eugene Bruguier then walked to defendant's automobile, which was parked near the mobile home. In the back seat of the car were sleeping Carol Archambeau and Bobby Cook, who had retired from the party earlier that morning. Bruguier testified that he got into the driver's seat, while defendant stood by the open door on the passenger side. At defendant's request, Bruguier left the car and opened the trunk, from which defendant removed a .22 caliber rifle. Bruguier then got back into the driver's seat and observed defendant standing near the open door of the passenger side. Bruguier testified that he then heard two gunshots fired by defendant from the rifle, which was pointed in the direction of the mobile home.

Jim Lee testified that as he was walking down the hallway of the mobile home shortly after the defendant had left, a bullet shattered the glass in the living room windows, whereupon Lee and Kenneth Archambeau dropped to the floor. Lee then

---

* Defendant was sentenced to seven years' imprisonment in the State Penitentiary. He remains free on $10,000.00 cash bond pending the outcome of this appeal, a fact over which the State is somewhat shirty, given the fact that defendant has had the benefit of court-appointed counsel, both at trial and on appeal.

heard another shot (later that morning the Vermillion police found two bullet holes in the mobile home and recovered one spent bullet). Kenneth Archambeau then walked out of the front door of the mobile home. Bruguier testified that after Kenneth Archambeau came out of the mobile home and was standing approximately twenty feet from defendant's automobile, he (Kenneth) said, "Shoot me. Shoot me." At this time the defendant was in the process of getting into the front passengers seat of the vehicle. Bruguier testified that although defendant fired the rifle in Kenneth Archambeau's direction, the rifle barrel was pointed toward the ground. After the shot was fired, defendant got back into the car. Bruguier then drove defendant and the two sleeping occupants to Gayville, South Dakota, where they were apprehended by law enforcement officers.

Defendant's version of the incident, supplied through Kenneth's defense testimony, was to the effect that Kenneth came out of the mobile home, approached the car, and attempted to take the rifle away from defendant. In the ensuing struggle, the rifle accidentally discharged, the bullet striking Kenneth in the abdomen.

Pursuant to defendant's motion, the trial court entered an order for discovery on August 21, 1981, which gave the State five days in which to furnish defendant the following items, among others:

1. All written or recorded statements allegedly made by the defendant or witnesses known to the State, and testifying at the preliminary hearing held in reference to the above Defendant which are relevant to the acts charged in the information.

. . . . .

5. Copies of all results or reports of physical or mental examinations, scientific tests, scientific experiments, or results thereof, which are within the control of the prosecuting attorney, and which are material to the facts alleged in the instant information.

On August 25, 1981, the State served a response to defendant's discovery motion, which stated in part:

1. Attached hereto as Exhibit A are written statements made by the defendant and other witnesses who testified at the preliminary hearing;

. . . . .

4. The State is in possession of certain photographs, drawings, guns, ammunition, bullets and shell casings which are intended to be used as evidence in chief at the trial in this matter and the same would be made available to you for your inspection at any time mutually convenient;

5. It is anticipated that the State will have certain physical examinations and reports available before this matter goes to trial and will make those available when they are in the State's possession.

Trial was scheduled to begin on October 8, 1981. On September 25, defendant made a motion for continuance and a motion for authority to hire at county expense an expert to examine the rifle that was used to commit the alleged crime, the empty cartridge cases and a bullet recovered at the scene, and the shirt that Kenneth Archambeau was wearing at the time of the alleged offense. In his affidavit in support of the motion, defendant's counsel acknowledged that he had received a copy of the fingerprint and ballistic tests conducted by the State with respect to the above described items of evidence, test results that the State itself had not received until September 22, 1981. Following a hearing on October 2, the trial court denied the motions but did assure the defense counsel that he would have the opportunity to interview the State's expert witness, Dr. Ilya Zeldes, prior to trial. In addition, on the morning of trial, the trial court stated that he would give defense counsel an opportunity to look at the evidentiary items before the commencement of the State's case. Defense counsel responded, "As long as we have an opportunity to look at them," to which the trial court replied, "We'll take enough time so you can inspect them and Mr. Archambeau can also look at them if he so desires."

By letter dated September 2, 1981, the state's attorney had informed defendant's attorney that:

I have today determined that the interview conducted by Sheriff Passick, State Agent Everson and Chief of Police Wright with the defendant was recorded and that tape is in the custody of Chief of Police Wright. I have instructed him that upon your request, at a time mutually convenient, you are to be allowed to listen to that recording.

The letter did not inform defense counsel that the interrogation of Bobby Cook, Eugene Bruguier, and Carol Archambeau had also been tape recorded. During an afternoon recess on the first day of trial, Thursday, October 8, the State gave defense counsel copies of statements of the witnesses whom the State intended to call, including that of Chief of Police Wright, whose statement revealed that the interviews with Bobby Cook, Carol Archambeau, and Eugene Bruguier had been tape recorded. On the morning of October 13, following a three-day weekend recess, defense counsel claimed that the late disclosure of the existence of the tape recorded interviews violated the trial court's discovery order. Defendant moved for a continuance or for an order prohibiting the State from introducing the evidence embodied in the tape recorded interviews. The state's attorney responded by stating that he did not intend to call either Carol Archambeau or Bobby Cook as witnesses for the State, that he himself had never listened to the tape recorded interviews, and that defendant had been furnished the written statements that had been compiled directly from the tapes. The trial court reserved its ruling on defendant's motion until the completion of the proceedings before the jury that day, at which time the trial court stated that it would allow a one-day continuance so that defense counsel could listen to the tapes and then interview the three potential witnesses. The trial court then asked defense counsel, "[I]s that agreeable with Mr. Nelson?", to which defense counsel replied, "Yes, that's fine." On the morning of October 15, following the one-day recess, defendant moved for an additional continuance for the purpose of having an expert listen to the tape recordings of the interrogation of Eugene Bruguier inasmuch as the recording was inaudible. The trial court denied the motion.

Defendant's first contention on appeal is that he was denied due process of law by the State's failure to comply with the discovery order entered by the trial court inasmuch as the State did not promptly inform defendant that the interrogation of Bobby Cook, Carol Archambeau, and Eugene Bruguier had been tape recorded.

At trial, the State attempted to excuse its noncompliance with the discovery order by arguing that it was required to disclose the recorded statements only of those witnesses whom the State intended to call at trial and that in any event the State had not kept secret the existence of the recordings. We do not view the discovery order as being so narrow in scope, however, and must therefore determine whether defendant suffered any material prejudice as a result of the late disclosure.

Although defendant relies on our decision in *State v. Sahlie,* 90 S.D. 682, 245 N.W.2d 476 (1976), that case is not dispositive of the issue inasmuch as there the State had simply failed to in any way comply with the discovery order to produce the requested items of evidence. In *State v. Reiman,* 284 N.W.2d 860 (S.D.1979), we modified our holding in *Sahlie* to the extent that *Sahlie* indicated that a failure to produce exculpatory evidence pursuant to a discovery order is, without exception, prejudicial error. In *Reiman,* the State had inadvertently failed to give a copy of a fingerprint report to the defendants until the trial was underway. Inasmuch as the fingerprint report stated that no fingerprints of the complaining witnesses or of three of the defendants were found at the scene of the crime, we held that those defendants were not prejudiced by the trial court's refusal to grant a continuance so that they could obtain the appearance of the FBI expert who had examined the fingerprints.

Late disclosure of exculpatory evidence is not to be equated with suppression of such evidence, especially in cases where defense counsel was able to make use of the information at trial. *State v. Moves Camp*, 286 N.W.2d 333 (S.D.1980). In *State v. Fox*, 313 N.W.2d 38 (S.D.1981), we held that the defendant had not been denied his constitutional right to a fair trial by the late disclosure of a tape recording of an interview between law enforcement officers and the State's principal witness in view of the fact that defense counsel had been given an opportunity to listen to the tape in its entirety before the trial actually commenced. In *State v. McKee*, 314 N.W.2d 866, 867 (S.D.1982), we held:

> Although a trial court's order for the production of evidence must be expeditiously carried out and obeyed, *State v. Sahlie*, 90 S.D. 682, 245 N.W.2d 476 (1976), not every failure to produce evidence as ordered is, without more, prejudicial error. *Marshall v. State*, 305 N.W.2d 838 (S.D.1981); *State v. Reiman*, 284 N.W.2d 860 (S.D.1979).

*See also Richards v. Solem*, 693 F.2d 760 (8th Cir.1982).

■ Granted that the State should have disclosed the existence of the tape recording of the interrogation of Bobby Cook, Carol Archambeau, and Eugene Bruguier, we conclude that defendant suffered no due process violation inasmuch as he was given an adequate opportunity to listen to the recording prior to the continuation of the trial. It is true that many of Bruguier's responses to the interrogating officer's questions are inaudible or barely audible on the tape, but from the repeating by the officers of Bruguier's answers it appears that Bruguier's verbal statements to the police were substantially the same as those that were reduced to writing and disclosed to defendant as a part of the State's August 25, 1981, response to the discovery order. Accordingly, we hold that defendant suffered no prejudicial error as a result of the late disclosure of the existence of the tape recording.

Defendant's next contention is that the trial court erred in denying his motion for authority to employ at state expense a ballistic and fingerprint expert to examine the rifle used in the shooting, the empty shell casings, the spent bullet recovered from the interior of the mobile home, and the shirt worn by the victim. Defendant contends that had he been able to establish through his own expert that the rifle bore the fingerprints of Kenneth Archambeau or that there were powder residues on the shirt worn by Kenneth Archambeau at the time of the shooting, he would have bolstered his defense of an accidental shooting following a struggle for the rifle.

Our rules of evidence, SDCL 19–15–9, provide that upon request the trial court may appoint one or more experts if it deems expert evidence desirable. In *State v. Sahlie, supra*, we set forth general guidelines that should be followed in determining when court-appointed experts are essential to an adequate defense:

> Initially, the request must be made in good faith. The request must be reasonable in all respects. The request must be timely and must set forth specific reasons which seem to make such services needed or necessary to the defendant. The request must specify that the defendant is financially unable to obtain the required service himself and that such services would otherwise be justifiably obtained were the defendant financially able.

90 S.D. at 690, 245 N.W.2d at 480.

■ Whether an expert should be appointed for a defendant in a criminal case is a decision committed to the discretion of the trial court. *State v. Vassar*, 279 N.W.2d 678 (S.D.1979); *State v. Sahlie, supra*; *Utsler v. State*, 84 S.D. 360, 171 N.W.2d 739 (1969); *State v. Geelan*, 80 S.D. 135, 120 N.W.2d 533 (1963). Although there may be cases in which it is essential that an expert be appointed for a criminal defendant, as, for example, when the physical evidence material to the defendant's guilt is of such a nature that a lay person cannot determine whether it is in the nature of contraband, see *State v. Hanson*, 278 N.W.2d 198 (S.D. 1979), we do not view this as such a case.

The record reveals that on September 22, 1981, defendant received copies of the written reports given to the State by Dr. Ilya Zeldes of the South Dakota Division of Criminal Investigation. As stated above, on September 25, 1981, defendant filed a motion for authority to hire a ballistics and fingerprint expert, giving as a reason for the request that "it is in the best interests of justice that this Court authorize the Defendant to hire at County expense a bullistics [sic] and fingerprint expert." At the hearing on the motion, defendant gave as reasons for wanting a ballistics expert the desire to refute, if possible, Dr. Zeldes' testimony and the desire to have the victim's shirt examined for powder residue.

At trial, Dr. Zeldes testified that he had tested the rifle for fingerprints and that the several partial finger or palm prints on the rifle had insufficient individual characteristics for identification purposes. He also testified that he had found no powder residue on Kenneth Archambeau's shirt.

In view of the foregoing, we cannot say that the trial court's refusal to appoint an expert constituted an abuse of discretion. Defendant's motion lacked the specificity contemplated by the guidelines we set forth in *Sahlie, supra.* Moreover, the evidence introduced at trial made it highly unlikely that any expert appointed on behalf of defendant would have reached any conclusions regarding the fingerprints or gunpowder residue that would have been different from Dr. Zeldes' findings.

Finally, defendant contends that his due process rights were violated by the State's failure to preserve the bandages that were placed over the victim's wounds and to have them tested for the presence of powder residue. Passing the fact that defendant did not raise this issue in the trial court, he has directed us to no evidence that would support a finding that any agent of the State had any part in disposing of the bandages. Accordingly, the State cannot be held to have suppressed any exculpatory material in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See United States v. Johnston,* 543 F.2d 55 (8th Cir.1976). We need not determine, therefore, whether the destroyed evidence would in fact have been exculpatory, as we were required to do in *State v. Helmer,* 278 N.W.2d 808 (S.D.1979). *Cf. State v. Hartley,* 326 N.W.2d 226 (S.D.1982); *State v. Parker,* 263 N.W.2d 679 (S.D.1978); *State v. Kietzke,* 85 S.D. 502, 186 N.W.2d 551 (1971). As the Court of Appeals for the Eighth Circuit aptly stated in *Richards v. Solem, supra,* "Although the state has a duty to disclose evidence, it does not have a duty to create evidence." 693 F.2d at 766. Likewise, we hold that the State had no obligation to preserve potential exculpatory evidence that was not within its control.

The judgment of conviction is affirmed.

All the Justices concur.