**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Edwin Charles SWALLOW, a/k/a Woodrow John Swallow, Jr., Defendant and Appellant.**

**No. 15285.**

Supreme Court of South Dakota.

Argued Jan. 13, 1987.

Decided April 22, 1987.

**32**

Craig M. Eichstadt, Asst. Atty. Gen., Mark V. Meierhenry, on brief, Atty. Gen., Pierre, for plaintiff and appellee.

Robert Van Norman, Rapid City, for defendant and appellant.

MORGAN, Justice.

Defendant Edwin Charles Swallow (Swallow) appeals from January 30, 1986, convictions of first-degree murder and the subsequent sentences imposed. We affirm on all issues.

Around midnight on April 8, 1982, Conrad Wilson (Conrad) and his daughter Cynthia Wilson (Cynthia) were shot and killed at their Rapid City, South Dakota, home. Walter Weddell (Weddell), pleaded guilty to first-degree manslaughter in connection with the death of Conrad and was sentenced to sixty-five years in prison. Swallow was brought to trial on January 6, 1986. The jury convicted him of two counts of first-degree murder on January 30, 1986, and he was sentenced to life in prison without parole for the murder of Cynthia and life in prison for the murder of Conrad. These sentences are to be served consecutively, beginning after the expiration of the forty-five-year sentence Swallow was currently serving in Texas.

On the night of April 8, 1982, residents in the 800 block of Fourth Street in Rapid City telephoned the police to report a violent episode which had just occurred in their neighborhood. One neighbor reported a car driving rapidly from the scene; another heard gun shots; a third saw someone moving around the house; and, a fourth saw a taller person walking to the street and heard that person remark: "I think I got 'em." Upon arrival, officers found Conrad, barely alive, on the front porch and Cynthia, dead of a single shotgun blast, just inside the front door. The rear door of the house had been forced open and there was physical evidence that the shotgun blast came from inside the house. Conrad had been an illicit drug dealer for approximately five years, but Cynthia was not involved in these activities.

During the course of the gunfight, a companion of Weddell and Swallow, Michelle Richards (Richards), was shot and wounded in the arm. Richards was taken

to the house of Linda Brewer (Brewer) who testified at the preliminary hearing that Richards, Swallow and Weddell came to her house around 12:30 a.m. on April 9, 1982. According to Brewer, Richards and Weddell talked about a shootout and wanted to return to the scene of the crime for Richards' gun, a .22 caliber revolver. A .22 caliber revolver was recovered by police at the scene of the crime. Brewer was unavailable for testimony at trial and her prior sworn testimony was presented to the jury. Val Freeman (Freeman), a guest at Brewer's house, also testified that Swallow, Richards, and Weddell were present at Brewer's house. She also testified that Weddell said that he had "got 'em." Freeman further reported that Swallow appeared to be more nervous than the other two and that he was carrying a shotgun.

Weddell and Richards were both present at trial but refused to testify on the grounds that their testimony might tend to incriminate them. Earlier sworn statements given by both Weddell and Richards were received in evidence. Weddell claimed he went to Conrad's house to straighten out an earlier drug deal. He stated that Swallow was in the car when he left and when he returned. Weddell's version of the killings was that he was standing on the porch speaking with Conrad about the drug deal and that Conrad began firing when Richards approached the porch. Richards was struck by Conrad's initial shot, after which Weddell began returning fire. Weddell stated that he returned fire while assisting Richards back to the car.

Richards, in her sworn statement, claimed that Weddell asked her to drive him to Conrad's house so that he could pick up some money that Conrad owed him. Richards claimed she had no knowledge of the past drug sale. Richards stated that Weddell approached the house and began arguing with Conrad, whereupon she approached the house in an attempt to get Weddell to leave. Richards stated that Conrad then pulled a gun and fired, striking her in the arm. After being shot, Richards remembers little other than her feelings of faintness and nausea. She claimed

that Swallow was at the car when she left, but could not say if he was at the car when she returned. Richards also denied seeing any other weapons other than Conrad's.

After the shooting Swallow fled to Seattle, Washington, where he met Dennis Nelson (Nelson) and Patrick Donahue (Donahue). Swallow later made incriminating statements to both Nelson and Donahue which were used against him at trial.

On February 11, 1982, fifty-one days prior to the murders, an armed robbery occurred at Conrad's house. The robbery was committed by either two or three Indian males. Conrad and Cynthia described the robbers to several people including family members but did not report the incident to the police. The hearsay statements of Conrad and Cynthia, according to the various witnesses, related the robbers as being Indian males, one larger and one smaller. The larger person brandished a shotgun while the smaller one carried a handgun. Conrad and Cynthia told the various witnesses that the robbers had discussed killing them, but decided to lock them in the basement instead.

On appeal, Swallow raises eleven issues which we will discuss in the order in which he presents them. For purposes of this appeal, we granted additional pages for briefing in excess of our statutory limit. While this is a measure rarely taken, we believe it was necessary in this case. We commend the attorneys on their prudent use of the additional space and on the exceptional quality of the briefs.

■ Swallow's initial complaint of error centers around the admission of evidence concerning the February 11, 1982, robbery. The admission of the prior robbery evidence involves two distinct questions, one dealing with admission of hearsay and one dealing with admission of bad acts evidence. Although there are many exceptions, hearsay is generally inadmissible as evidence. SDCL 19–16–4. The statements of Conrad and Cynthia to Annette Roeder-Hunt (Roeder-Hunt) and some family members were hearsay. The trial court cited two exceptions to the hearsay rule, SDCL

19–16–28 (Rule 803(24)), one of the so-called residual exceptions, and SDCL 19–16–6 (Rule 803(2)), the excited utterance exception, and admitted the statements. Initially, we note that since Cynthia and Conrad were unavailable at the timë of the trial, the trial court erroneously relied on SDCL 19–16–28 (Rule 803(24)), which applies to hearsay statements where the declarant is available, rather than SDCL 19–16–35 (Rule 804(b)(6)), which is applicable to hearsay where declarant is unavailable. We deem this erroneous citation to be of little consequence since the text of the rules is nearly identical and we have said that SDCL 19–16–28 requires that a higher level of reliability be established where the declarant is available than were he unavailable. *State v. O'Brien*, 318 N.W.2d 108 (S.D.1982).

■ We believe that, to some extent, the trial court erroneously applied the excited utterance exception to the hearsay evidence in this case. Roeder-Hunt came on the scene just minutes after the robbery and the statements of Conrad and Cynthia at that time clearly qualified as excited utterances. We do not believe, however, that statements made to family members on the next day qualified as excited utterances. We decline an exhaustive review of the admissibility of that testimony as excited utterances, however, since we believe the statements were admissible under one of the so-called residual exception. SDCL 19–16–35 (Rule 804(b)(6)).

The Federal Rules of Evidence, which were adopted nearly in their entirety by South Dakota, recognize that there may be evidence that meets admissibility requirements, but may not be governed by one of the specific exceptions embodied in the federal rules. To address this problem, SDCL 19–16–35 (Rule 804(b)(6)) was adopted.

A statement not specifically covered by any of §§ 19–16–30 to 19–16–34, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19–16–4 if the declarant is unavailable as a witness and if the court determines that

(1) the statement is offered as evidence of a material fact;

(2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

However, a statement may not be admitted under this section unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant. SDCL 19–16–35.

■ Initially, we believe that equivalent circumstantial guarantees of trustworthiness existed with the hearsay statements of Conrad and Cynthia. The statements primarily consisted of physical identifications of the robbers and their activities while they were present in the house. In *State v. Luna*, 378 N.W.2d 229 (S.D.1985), we noted some criteria to be considered in determining trustworthiness. Specifically, we noted circumstances such as (1) the nature of the statements, written or oral; (2) the character of the statements; (3) the declarant's relationship to the witness; (4) the declarant's motivation for making the statements; and (5) the circumstances under which the declarants made the statements. The trial judge explicitly considered these factors and admitted the evidence. In view of the close relationship between the witnesses and the declarants, the lack of motive for falsifying, the basic consistency of the statements, and the relative close proximity of the statements to the stressful event, we find that the trial court did not err when it determined that the statements contained the circumstantial guarantees of trustworthiness required for admission.

■ In addition to the requirements of trustworthiness, the statements also must meet the other four elements of SDCL 19–16–35 (Rule 804(b)(6)). The hearsay state-

ments were offered as evidence of material facts, *i.e.*, identity of the robber and motive for the crime charged. The statements were more probative on the point than any other evidence which could be procured through reasonable efforts since there was no other evidence which could be procured. Admitting hearsay statements of slain witnesses meets the general purposes of these rules and best serves the interests of justice. The final element required by the statute is notice to the adverse parties sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to meet the evidence. These hearsay statements were the subject of pretrial motions much in advance of trial. In any event, Swallow does not claim that he was denied notice of the intent to use the hearsay statements. For a case with somewhat similar facts see *United States v. Van Lufkins*, 676 F.2d 1189 (8th Cir.1982).

■ In the alternative, Swallow argues that if the hearsay statements were admissible under SDCL 19–16–35 and SDCL 19–12–5 they should have been excluded under SDCL 19–12–3 (Rule 403) since their probative value was substantially outweighed by the danger of unfair prejudice. SDCL 19–12–3 (Rule 403) vests a great deal of discretion in the trial court.

> The usual approach on the question of admissibility on appeal is to view both probative force and prejudice most favorably toward the proponent, that is to say, to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value. The trial court will lean towards this approach since the thrust of the Federal Rules favors admissibility. ... [T]he trial judge should be able to weigh probative force and prejudice fairly accurately in the light of the special trial conditions and circumstances that he can observe. Trial judges will rule in a way that will enable them to finish the trial with an abiding sense that rationality rather than prejudice decided the issues.

1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 403[03], at 403–46 through –52 (1986). The hearsay statements admitted were of high probative value since they were the only evidence of the prior robbery which tended to establish identity and motive. In addition, we believe the danger of *unfair* prejudice was slight since the evidence tied the defendant to a crime of a much lesser degree than that which he was being tried.

■ Although the evidence was admissible as an exception to the hearsay rule, our inquiry may not end there. Since the evidence of the February 11, 1982, robbery involved prior bad acts we must determine if the trial court abused its discretion in admitting evidence of these prior bad acts under SDCL 19–12–5 (Rule 404(b)). *State v. Rose*, 324 N.W.2d 894 (S.D.1982). Swallow spent a great deal of time arguing that the lack of identification of Swallow or other evidence linking him to the robbery resulted in the erroneous admission of this evidence. While we believe this evidence is useful to establish at least identity and motive, motive alone is enough under SDCL 19–12–5. Even if Swallow was not in attendance at the first robbery, the first robbery still could have established a motive for his actions on the night of April 8, 1982. He may have been simply assisting a friend, Weddell, and his cousin, Richards, to dispose of some witnesses to an earlier crime.

In any event, there are significant factors connecting the February 11, 1982, robbery with the April 9, 1982, murders. It seems much more than coincidental that in a span of only fifty-one days two or three Indian males, matching the general descriptions of Weddell and Swallow would violently enter the same house in Rapid City, South Dakota, the larger one armed with a shotgun and the smaller armed with a handgun. Furthermore, there was evidence presented that during the first robbery the robbers talked of killing the witnesses. There was also evidence indicating that the murderers knew their way around the house, which indicated that they had been there on an earlier occasion. Somewhat similar evidence was introduced in other recent South Dakota cases with subsequent approval by this court. *See State*

*v. Tiger*, 365 N.W.2d 855 (S.D.1985); *State v. Johnson*, 316 N.W.2d 652 (S.D.1982).

Swallow argues that his identity was not established by the accounts of the first robbery because Roeder-Hunt stated that the declarants described the larger Indian male as being "big and fat." Swallow, at six-foot-two and one-hundred-eighty-five pounds, claims that this description does not suit him. We note that Roeder-Hunt was the only one who described the larger person as being fat while the several other witnesses described him only as being large. We also note that Roeder-Hunt claimed at trial that the fat description was inaccurate and that the description should have been a large athletic-type build. In light of the foregoing, we cannot say that the trial court abused its discretion in admitting the evidence of the February 11, 1982, robbery in this case.

Swallow next contends that the trial court erred in excluding evidence of the nature of Weddell's prior convictions during Swallow's impeachment of Weddell. Limitation of cross-examination under SDCL 19–14–12[1] is in the sound discretion of the trial court and the trial court will be reversed only on an abuse of discretion. *State v. King*, 346 N.W.2d 750 (S.D.1984). Swallow claims the trial court abused its discretion when it refused to allow Swallow to inquire into the specific nature of Weddell's prior felony convictions. Weddell was convicted of two counts of second-degree murder in 1977 which stemmed from an argument in a North Dakota bar where Weddell fired four shots from a revolver concealed in his jacket pocket.

■ SDCL 19–14–12 is closely modeled on Federal Rule of Evidence 609(a). Our rule, however, contains one important distinction. Unlike the South Dakota statute,

Rule 609(a) speaks of prejudicial effect *to the defendant*. SDCL 19–14–12 on the other hand, however, speaks of prejudicial effect *to a party or the accused*. While the limitation of cross-examination placed on Swallow in this case may be an abuse of discretion under the federal rule,[2] we do not believe it is an abuse of discretion under SDCL 19–14–12.

■ The trial court proceeded to balance the prejudicial effect to the state by the admission of the nature of the crimes committed by Weddell and determined that inquiry into the specific nature of the North Dakota crimes was too prejudicial. Swallow relies on *People v. Woodle*, 121 Mich. App. 336, 328 N.W.2d 412 (1982). This case is somewhat confusing and is distinguishable from the case at bar. Initially, we note that the nature of the crime in *Woodle* was admitted and the trial court excluded only specific facts about the crime. Furthermore, it is difficult to tell whether the Michigan appellate court held that the specific facts were so similar that they should have been admitted or whether it was relying on confrontation grounds. Furthermore, the Michigan court apparently believed that violation of the confrontation clause resulted in automatic reversal. This is no longer the case under *Delaware v. Van Arsdall*, 475 U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In addition, the facts in *Woodle* were much more similar than the facts involving the convictions in the instant case. The only similarity appears to be that Weddell used a handgun in both incidents. Based on the foregoing we cannot say that the trial court abused its discretion in limiting the cross-examination pursuant to SDCL 19–14–12.

The limitation of cross-examination of a prosecution witness also raises confrontation clause questions. Swallow relies pri-

---

1. SDCL 19–14–12 reads:
 For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or the accused and the crime
 (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or

(2) involved dishonesty or false statement, regardless of the punishment.

2. *See United States v. Miller*, 478 F.2d 768 (4th Cir.1973); *Beaudine v. United States*, 368 F.2d 417 (5th Cir.1966); 3 J. Weinstein & M. Burger, *Weinstein's Evidence* ¶ 609[04], at 609–69 & 609–38 (1985).

marily on the case of *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis,* the defendant was trying to expose possible bias on behalf of a witness by exposing his prior juvenile adjudications. Alaska state law prohibited the use of the juvenile record in this manner. The United States Supreme Court reversed, claiming that the defendant's right to confrontation overrode the state's interest in protecting the juvenile. *Davis* is distinguishable from the case at hand on its facts and because it dealt with bias rather than credibility of a witness. State cites the case of *People v. Tait,* 136 Mich.App. 475, 356 N.W.2d 33 (1984), which is on point. Michigan's statute, like SDCL 19–14–12, fails to limit the balancing of the probative value against the prejudicial effect only to the defendant. The *Tait* court analyzed the allegedly competing lines of authority and concluded:

> Courts should be more reluctant to exclude evidence of prior convictions of prosecution witnesses than prior convictions of defendants, because the prejudicial effect of the former is inherently less than that of the latter. However, the danger that the jury will use evidence of prior convictions of a witness for an improper purpose is a danger affecting the integrity of the fact-finding process. ... Therefore, where a trial court gives full consideration to all relevant factors and properly concludes that the probative value on the issue of credibility of the evidence of a prior conviction of a prosecution witness does outweigh its prejudicial effect, no denial of confrontation is presented. The state's interest in the integrity of the fact-finding process outweighs the defendant's interest in confronting a prosecution witness with evidence of a prior conviction of low probative value and high prejudicial effect.

*Id.* at 481, 356 N.W.2d at 35–36.

Several courts have also noted the importance of testimony exposing possible bias of a witness as opposed to testimony simply going to the credibility of the witness. *Tait, supra; Bilbrey v. State,* 594 S.W.2d 754 (Tex.Crim.App.1980). Here we are dealing with Weddell's credibility rather than any possible bias. Testimony relating to his 1977 murder convictions would not show that Weddell has anything to gain from the authorities by his favorable testimony in this case.

■ Even if the omission of this evidence could be said to be a violation of the confrontation clause, we believe that it was harmless error beyond a reasonable doubt for the trial court to exclude the evidence. *See Delaware v. Van Arsdall, supra* (specifically holding that denial of a defendant's opportunity to impeach in violation of the confrontation clause is subject to the *Chapman* harmless error analysis). Since this issue involves a federal constitutional question we apply the *Chapman* harmless error analysis rather than the harmless error analysis developed in the South Dakota cases. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

> Since Chapman, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [citations omitted] The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, [citation omitted] and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*Van Arsdall,* 475 U.S. at ——–——. 106 S.Ct. at 1436–37, 89 L.Ed.2d at 684–85; *Rose v. Clark,* 478 U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The record indicates that the trial court allowed Swallow to impeach Weddell with the specific nature of felony convictions other than the North Dakota murders. Furthermore, the jury knew that Weddell was an active participant in the murders of Conrad and Cynthia. Further evidence on Weddell's credibility would have been cumulative and added little to the inquiry. We believe the exclusion of the specific nature of Wed-

dell's 1977 murder convictions, considered in light of the entire record, was harmless beyond a reasonable doubt.

Swallow next contends that the trial court erred by refusing to exclude for impeachment purposes his tainted confession to a Texas investigator. While Swallow was incarcerated in Texas awaiting trial, a Texas law enforcement officer questioned him regarding the slayings of Conrad and Cynthia. Swallow had appointed counsel who was not present at the interrogation. Swallow refused to speak to the investigator on tape. After Swallow's refusal, the investigator turned off the tape recorder and continued to interrogate Swallow. The investigator testified that he assumed that any statements Swallow made would be inadmissible. He also informed Swallow that any statements he might make could not be used against him. During this interrogation, Swallow made damaging admissions. In the course of a pretrial hearing on a suppression motion, it was undisputed, and the trial court so ruled, that the admissions could not be used during State's case-in-chief. The trial court, however, refused to rule on the exclusion of the evidence for the purpose of impeachment and indicated that the admissions would be available to State if Swallow should take the stand and testify contrary to the admissions.

 Initially, State claims that since Swallow did not testify and since the evidence was not admitted the issue is not preserved on appeal. In support of this contention, State cites *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984); *State v. Means,* 363 N.W.2d 565 (S.D.1985); *State v. Dickson,* 329 N.W.2d 630 (S.D.1983); and *State v. Cody,* 323 N.W.2d 863 (S.D.1982). *Luce, Means,* and *Dickson* did not deal with constitutional issues which distinguish them from the instant case. One case cited by State, *State v. Cody, supra,* involved a constitutional issue and we addressed that issue even though the defendant did not testify. Likewise, the United States Supreme Court has addressed issues dealing with constitutional questions even though the defendant failed to testify at trial. *See*

*New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

Swallow contends that the threatened use of this confession violates his due process rights and his right to counsel. Swallow contends that his confession to the Texas investigator was involuntary and thus a due process violation since the investigator had informed him that anything he said could not be used against him. In support of this contention, Swallow cites the United States Supreme Court cases, *New Jersey v. Portash, supra,* and *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). We find his reliance on these cases to be misplaced.

*Mincey* pointed out an important distinction when it comes to the exclusion of confessions obtained in violation of the constitutional rights protected under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

> Statements made by a defendant in circumstances violating the strictures of Miranda v. Arizona ... are admissible for impeachment if their "trustworthiness ... satisfies legal standards." [citations omitted] But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, "even though there is ample evidence aside from the confession to support the conviction."

*Mincey,* 437 U.S. at 397–98, 98 S.Ct. at 2416, 57 L.Ed.2d at 303 (emphasis in original). *Mincey* examined statements which the Court characterized as resulting from virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness. As the Court said: "[T]he undisputed evidence makes clear that Mincey wanted *not* to answer Detective Hust. But Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne." *Id.* at 401–02, 98 S.Ct. at 2418, 57 L.Ed.2d at 306. In *Portash, supra,* the Court considered the admissibility of immunized testimony before a grand jury for impeach-

ment purposes. The Court stated: "Testimony given in response to a grant of legislative immunity is the essence of coerced testimony." 440 U.S. at 459, 99 S.Ct. at 1297, 59 L.Ed.2d at 510.

In a very recent decision, *Colorado v. Connelly*, 479 U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court emphasized that "coercive government misconduct was the catalyst for this Court's seminal confession case, *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936)." *Id.* at ——, 107 S.Ct. at 520, 93 L.Ed.2d at 482. Citing *Mincey*, the Court went on to state:

Thus the cases considered by this Court over the 50 years since Brown v. Mississippi have focused upon *the crucial element of police overreaching.* While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, *all have contained a substantial element of coercive police conduct.* Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Id.* at ——, 107 S.Ct. at 520, 93 L.Ed.2d at 482 (emphasis added). Swallow does not contend that he was being forced to speak to the investigator, nor does he claim that he was under any physical impairment or subjected to any psychological pressures that resulted in the confession.

Relying primarily on the Michigan Supreme Court case of *People v. Gonyea*, 421 Mich. 462, 365 N.W.2d 136 (1984), Swallow contends that the threatened use of the confession for impeachment also violated his right to counsel. While we agree that Swallow's right to counsel may have been violated, we do not believe that such a violation must necessarily result in the total exclusion of the confession. The *Gonyea* court, when speaking of the right to counsel, stated:

A right so important to the sound maintenance of our system of justice must be protected with the broadest prophylactic measures possible. Therefore, we must

hold that a confession extracted in violation of defendant's right to counsel is not only inadmissible for substantive purposes, but inadmissible for impeachment purposes.

*Id.* at 478, 365 N.W.2d at 143. While we agree that the right to counsel is of great importance to our system of justice, we do not believe that this right should be contorted into a rule that would effectively countenance perjury. Other courts agree. *United States v. McManaman*, 606 F.2d 919 (10th Cir.1979); *United States v. Frank*, 520 F.2d 1287 (2d Cir.1975) *cert. denied* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *People v. Jacobs*, 181 Cal.App.3rd 916, 226 Cal.Rptr. 786 (1986), review granted. The United States Supreme Court in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), held that statements of an accused made while in custody prior to having or after effectively waiving counsel could be used for impeachment purposes. We see little difference in the circumstances in this case. In *Harris*, the *Miranda* rights of the defendant, including the right to counsel, had already attached. Swallow's *Miranda* rights had likewise attached. The only difference from *Harris* is that Swallow was already represented by counsel.

Swallow further claims that because the trial court refused to suppress the statements he was deprived of taking the stand in his own defense. As a result, he alleges he was denied equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States. The sanction of suppression of evidence obtained by State in violation of a defendant's constitutional rights is "a clear, specific, and constitutionally required—even if judicially implied—deterrent safeguard[.]" *Mapp v. Ohio*, 367 U.S. 643, 648, 81 S.Ct. 1684, 1688, 6 L.Ed.2d 1081, 1086 (1961). There is, however, a valid distinction between suppression for use in State's case-in-chief and in use for impeachment purposes.

As the United States Supreme Court said in *Walder v. United States*, 347 U.S. 62,

65, 74 S.Ct. 354, 356, 98 L.Ed. 503, 507 (1954):

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Walder* was decided before the development of the *Miranda* Rule, but the decision was adhered to in *Harris v. New York, supra,* which dealt with impeachment use of a statement that was otherwise inadmissible because of a violation of the *Miranda* Rule. We find language from *Harris* applicable to Swallow's complaint:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [citations omitted] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

401 U.S. at 225, 91 S.Ct. at 645–46, 28 L.Ed.2d at 4. *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), followed *Harris* with this language: "The effect of inadmissibility in the Harris case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth." 420 U.S. at 723, 95 S.Ct. at 1221, 43 L.Ed.2d at 578.

■ This rule was tempered in *Mincey v. Arizona, supra,* in the case of involuntary statements, but, as we have previously discussed herein, the statements in issue in this case do not fall within the *Mincey* exception. Thus, except in cases involving "a substantial element of coercive police conduct" the use for impeachment remains. *Connelly,* 479 U.S. at ——, 107 S.Ct. at 520, 93 L.Ed.2d at 482. We hold, therefore, that the trial court was correct in refusing to exclude the tainted statements for impeachment purposes.

Swallow's fourth issue relates to the admission of the testimony of witness Dennis Nelson (Nelson) who related damaging admissions made to him by Swallow. Shortly after the double murder, Swallow fled to Seattle, Washington, where he rented an apartment from Nelson. While the relations between Nelson and Swallow were initially friendly, they had deteriorated by the time Swallow made the admissions to Nelson. A short time after Swallow moved from Nelson's building, Nelson learned that Swallow was wanted on federal warrants and that there was a reward offered for information leading to his arrest. Nelson informed the FBI of Swallow's whereabouts and shortly thereafter Swallow was arrested. While incarcerated in Washington, Swallow made threatening phone calls on a regular basis to Nelson and Nelson's family. Nelson contacted the FBI and the local sheriff's department in an effort to prevent further calls from Swallow. According to Nelson, during one of these conversations "[Swallow] called and I asked him if he done [sic] it and he said, yes, and I asked him why and he said, 'They were shooting at him.'" Nelson subsequently related this statement to the FBI when he was specifically asked if Swallow had made any admissions to him.

■ Swallow relies on *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985), to support his argument that Nelson's testimony was improperly admitted. We do not agree. At issue in *Moulton* were statements made by Moulton to a co-defendant named Colson who, unbeknownst to Moulton, had made a deal with the police. Colson was "wired" for a meeting with Moulton where they intended to plan defense strategies. The Court found that Colson's remarks caused Moulton to make incriminating statements. As a result, the Court held those statements inadmissible as violative of Moulton's Sixth Amendment right to counsel. The Court said:

> The Sixth Amendment guarantees the accused, at least after the initiation of for-

mal charges, the right to rely on counsel as a 'medium' between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in the light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [citation omitted] However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity.

*Id.* at ——, 106 S.Ct. at 487, 88 L.Ed.2d at 485–486.

In this case, Nelson testified that the FBI did not ask him to talk with Swallow and never asked him to "get" information from Swallow. Indeed, Swallow initiated the threatening telephone calls. Nor were there any strings attached to the reward that Nelson was in the process of receiving for giving information that led to Swallow's arrest. Nelson simply was not an agent of the government as was the case in *Moulton.*

▉▉▉▉ Swallow's fifth contention on appeal deals with the refusal of the prosecution and the trial court to immunize Richards. At the time of trial, Richards refused to testify because she believed her answers may tend to incriminate her. At this juncture, Swallow attempted to have Richards immunized against prosecution by either the state's attorney or the circuit judge under SDCL 23A–14–29 (Supp.1986). Under that statute, it appears that only the prosecuting attorney or the attorney general can grant witness immunity. It is clear, however, that the circuit judge presiding over the proceeding could effectively grant immunity by ordering such testimony. The

federal courts have devoted a good deal of discussion to precisely this issue. Lacking a deliberate intention on the part of the prosecution to distort the judicial fact-finding process, the courts will not order a judicially fashioned immunity. *United States v. Bazzano,* 712 F.2d 826 (3d Cir. 1982). In addition, it must be shown that the witness in question is likely to offer clearly exculpatory evidence before such a remedy will be granted. *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980), *cert. denied* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *Government of Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir. 1980). Another consideration before granting immunity is the likelihood that the witness for whom the immunity is sought is an actual or potential target of prosecution. Anytime such a showing is made, at least one court holds that "trial judges should summarily reject claims for defense witness immunity." *Turkish,* 623 F.2d at 778.

▉▉▉▉ In the instant case we find no evidence of prosecutorial misconduct in refusing to immunize Richards. Furthermore, we seriously doubt that truthful testimony from Richards would be clearly exculpatory. We believe there is a serious question of whether Richards would testify at all, given the fact that she refused to testify at earlier proceedings and served considerable time in jail for contempt of court. Richards earlier refused to testify even after being granted immunity, citing her religious beliefs. Finally, we find that Richards was a potential defendant. There is evidence indicating that Richards provided the transportation to the site of the crime and, further, there is evidence that Richards was armed and may have fired her weapon during the commission of a double homicide. We also note that there is evidence tying Richards to the shotgun used in the first robbery. While we do not now hold that any one of the three elements discussed above would be sufficient in and of itself to support a refusal to immunize a defense witness, we hold that under the facts of the instant case the trial court did not err in refusing to immunize Richards.

 Swallow's sixth contention on appeal centers around admission of statements to witnesses about drug deals and sawing off shotguns. The testimony complained of relating to drug deals was that of Nelson when he testified to the effect that: "I think there was the matter of drug deals talked about." That was the extent of the testimony about drug deals. We fail to see that this testimony is "evidence of other crimes, wrongs, or acts." SDCL 19–12–5 (Rule 404(b)). Nelson did not testify that Swallow was involved in drug deals, rather he merely stated that they had talked about some drug deals without giving any specifics. Another witness, Patrick Donahue, testified that Swallow had made a remark about showing Donahue how to saw off Donahue's expensive shotgun. While this evidence is somewhat tenuous since it was not shown that Cynthia was slain with a sawed off shotgun, it does tend to identify Swallow with shotguns, and is especially relevant in light of Freeman's testimony.

 We next address Swallow's contention that the trial court's refusal to appoint experts for his defense resulted in reversible error. At the outset, we note that Swallow was allowed to consult a forensic pathologist in preparation for his defense. We also note that there is no absolute right to engage expert witnesses at public expense. *State v. Vassar,* 279 N.W.2d 678 (S.D.1979). Once again, we are dealing with an abuse of discretion standard. *State v. Archambeau,* 333 N.W.2d 807 (S.D.1983). We do not believe that the employment of experts was necessary for an adequate defense. Swallow does not cite a single example where his cross-examination was inhibited by a failure to consult with an expert. Moreover, the kind of physical evidence introduced at trial made it highly unlikely that experts called by the defense would have disagreed with those called by the prosecution. *See Archambeau,* 333 N.W.2d at 812. We also note that Swallow used the experts called by the state to establish points favorable to his defense. In light of the foregoing, we do not believe the court abused its discretion in refusing to appoint certain experts for Swallow's defense.

 An issue involving an expert witness also forms Swallow's eighth contention on appeal. Swallow contends that the appointment of David Boyles, an assistant professor of chemistry at the South Dakota School of Mines and Technology as an expert witness in glass fracture analysis was an abuse of discretion. We have held that "[t]he qualification and competency of a witness to speak as an expert is primarily in the discretion of the trial court, and its ruling will be disturbed only in the case of a clear abuse of discretion." *State v. Disbrow,* 266 N.W.2d 246, 251–52 (S.D.1978). While Swallow cites cases where the experts have been more qualified than Boyles, we do not believe that the trial court clearly abused its discretion by allowing him to testify as an expert witness. The record reflects that Boyles has an extensive scientific background and that he possessed the technical knowledge needed to understand the technology and concepts used in the various authoritative texts on glass fracture analysis which he read. His lack of past experience in glass fracture analysis and his lack of classroom instruction on glass fracture analysis are points that were questioned on cross-examination of the witness. We believe that Boyles, through his wide readings on the subject coupled with his technical background, was minimally qualified to testify as an expert at the trial. His lack of experience goes to the weight and credibility of his testimony but does not in and of itself exclude its admissibility.

Issue nine deals with the death qualification of jurors which has previously been decided by this court and by the United States Supreme Court. *See Lockhart v. McCree,* 476 U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *State v. McDowell,* 391 N.W.2d 661 (S.D.1986).

 In his tenth issue, Swallow claims that several prospective jurors were tainted by references in the waiting room to his Texas convictions, mention of which was specifically excluded from the trial by the trial court. Swallow asked the trial court

to excuse each of these jurors for cause. A number of these jurors were excused for cause, but the trial court specifically found that two of the jurors in question were not tainted by the references to Swallow's past and allowed them to remain as prospective jurors. As a result, Swallow claims he was forced to use two peremptory challenges to remove those prospective jurors since he believed them to be tainted. We hold that the trial court's finding is not clearly erroneous, therefore the trial court did not abuse its discretion in failing to excuse these two jurors. We note in passing that none of the allegedly tainted jurors remained on the final jury panel.

 Swallow's final contention on appeal deals with the sentences handed down by the trial court. Initially, Swallow contends that the consecutive sentences he received for the two South Dakota convictions of first-degree murder were improper under SDCL 22–6–6.1. This court affords de novo review to matters of statutory interpretation. *Petition of Famous Brands, Inc.*, 347 N.W.2d 882 (S.D.1984). We believe the statute is specific on its face and that it allows for consecutive sentences "regardless of when the offenses were committed or when the judgment or sentence was entered." Swallow also complains that the judge's reference to "the forty-five-year sentence you are presently serving in the State of Texas" was inadequate to impose a consecutive sentence to be served after the Texas incarceration. Specifically, Swallow contends that "[s]uch an abbreviated reference to his Texas sentence is too indefinite and insufficient as a basis for imposing the South Dakota sentences consecutively to a Texas sentence." We believe that the Texas sentence was sufficiently identified and that no confusion resulted by the imposition of the sentence by the language of the trial court.

 Lastly, Swallow contends that the sentences imposed by the trial court are constitutionally infirm under *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Before we proceed to the traditional "within and without the jurisdiction" proportionality test, the sentence must initially shock the conscience of this court. *State v. Andrews*, 393 N.W.2d 76 (S.D.1986); *State v. Weiker*, 366 N.W.2d 823 (S.D.1985). We distinguish this case from *State v. O'Connor*, 378 N.W.2d 248 (S.D.1985), wherein we remanded a case involving two life sentences. *O'Connor* involved sentences imposed under the recidivist statute, which is not involved here. In view of the facts of this case as previously set forth, the sentence handed down does not shock the conscience of this court.

The foregoing issues having been disposed of, we affirm the conviction and the sentences imposed by the trial court.

WUEST, C.J., and MILLER, J., concur.

HENDERSON, J., concurs in result without writing.

SABERS, J., dissents.

SABERS, Justice (dissenting).

I am impressed with the trial court's rulings in this complicated case except for the refusal to suppress incriminating testimony by witness Dennis Nelson. In my view, Swallow's constitutional right to counsel was violated by the admission of this harmful testimony by Nelson, who became an "agent of the State."

The facts show that:

—Nelson informed on Swallow and identified him for arrest.

—Nelson knew of a reward and discussed it with agents on the day of the arrest.

—Nelson did not receive the reward money (which he claimed was $25,000 but was actually $2,500) in one lump sum, but in $500 installments while he was soliciting information from Swallow for the FBI.

—The day after the arrest, agents asked Nelson whether Swallow had made admissions; Nelson said he had not.

—Nelson acknowledged that he knew the agents were interested in admissions.

—Nelson and Swallow later talked often by telephone, which agents knew.

—Nelson and the agents stayed in contact about every three days; the agents continued to be interested in admissions.

The facts further show that Nelson solicited information from Swallow, finally asking if he had "done it", to which Swallow supposedly said, "yes." Nelson asked "why" and he allegedly said "they were shooting at him." This solicited admission came a week or two after Nelson's first FBI contact. Nelson, in turn, told the agents about the admission when they "finally" asked him. Nelson had not yet received any *one* of the $500 installments at that time.

In *Maine v. Moulton*, 474 U.S. 159, ——, 106 S.Ct. 477, 487, 88 L.Ed.2d 481, 496 (1985), the United States Supreme Court stated:

> However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

The Court explained the "knowing exploitation" and "knowingly circumventing" language as follows:

> Direct proof of the State's knowledge will seldom be available to the accused. However, as *Henry* makes clear, proof that the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation.

*Id.*, 474 U.S. at ——–——, 106 S.Ct. at 487–488 n. 12, 88 L.Ed.2d at 496 n. 12, citing *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

In *Henry*, the Court held that the defendant's post-indictment incriminating statements made to a government informant while in jail pending trial were inadmissible as having been obtained in viola-

tion of defendant's Sixth Amendment right to counsel. The Court wrote:

> [T]he concept of a knowing and voluntary waiver of Sixth Amendment rights does not apply in the context of communications with an undisclosed undercover informant acting for the Government. [citation omitted] In that setting, [defendant], being unaware that [informant] was a Government agent expressly commissioned to secure evidence, cannot be held to have waived his right to the assistance of counsel.

*Id.*, 447 U.S. at 273, 100 S.Ct. at 2188, 65 L.Ed.2d at 124.

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the defendant, having been indicted for violating federal narcotics laws and released on bail, made incriminating statements to his codefendant, who was acting as an agent for the Government. In reversing the conviction, the Court said:

> We hold that the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.... '[I]f [the Sixth Amendment] is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, [defendant] was more seriously imposed upon ... because he did not even know that he was under interrogation by a government agent.'

*Id.*, 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250.

Here, it is clear from Nelson's testimony and the reasonable inferences drawn therefrom that he was being paid on the installment basis so that he would continue to cooperate with the State in supplying information obtained from Swallow. In light of *Moulton, supra,* Nelson was a paid government informant. Under the *Massiah* and *Henry* decisions, Swallow, having been charged and arrested, could not have knowingly and voluntarily waived his right

to assistance of counsel in relation to his conversations with Nelson because he was unaware that Nelson was an informant commissioned to secure evidence for the State.

In criminal actions, South Dakota has long recognized an accused's constitutional and statutory guarantee of right to counsel. *State ex rel. Burns v. Erickson,* 80 S.D. 639, 645, 129 N.W.2d 712, 715 (1964). "Courts carefully protect the right and will not condone a perfunctory compliance through which an accused defendant is given the appearance of the help of a lawyer but is actually denied substantial aid." *State ex rel. Parker v. Jameson,* 75 S.D. 196, 197–198, 61 N.W.2d 832, 833 (1953). Swallow's Sixth Amendment right to counsel should be given a broad not a narrow interpretation. *Michigan v. Jackson,* —— U.S. ——, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986). Accordingly, Swallow's constitutional right to counsel was violated and this highly prejudicial testimony should have been suppressed.