STATE of South Dakota, Plaintiff and Appellee,

v.

William R. CODY, Defendant and Appellant.

No. 13257.

Supreme Court of South Dakota.

Argued Sept. 30, 1981.

Decided Aug. 25, 1982.

Jon R. Erickson, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Lee A. Tappe of Tappe & Vavra, P. C., Platte, for defendant and appellant.

HENDERSON, Justice.

## ACTION

This case originally stems from a jury verdict which found William R. Cody, a/k/a William Weeks, guilty of premeditated murder. Judgment was accordingly entered and a life sentence imposed. Cody thereafter appealed to this Court which reversed the conviction and remanded the case for a new trial due to a violation of Cody's right to counsel. *State v. Cody*, 293 N.W.2d 440 (S.D.1980). Cody subsequently

filed a motion to suppress certain evidence and statements allegedly collected in violation of his constitutional rights; said motion was denied. A second jury trial thereupon resulted in a guilty verdict of premeditated murder. This appeal ensued.

## FACTS

The facts pertinent to this appeal, as set forth in *State v. Cody* (hereinafter referred to as *Cody I*), 293 N.W.2d at 442, are as follows:

> On February 28, 1978, Cody was arrested in Las Vegas, Nevada, on an unlawful flight warrant issued by a Pennington County Magistrate on a charge of embezzlement and grand larceny. On that same day, a preliminary information and arrest warrant were filed in Tripp County charging Cody with the murder of Edmund Brown, a Winner, South Dakota businessman. Cody was incarcerated in the Clark County jail in Las Vegas that afternoon; he was later taken into the interrogation room and interrogated first by Assistant District Attorney Steve Carson and Detective David Hanson, both of Las Vegas. From approximately 5:00 p. m. to 9:30 p. m., Cody was then interrogated by Marc Tobias, an attorney representing the Division of Criminal Investigation for the State of South Dakota.
> During this four-hour interrogation by Tobias, which was tape recorded and later transcribed, Cody was never afforded counsel, although several requests for counsel were made by Cody. During the later stages of the interview, however, Tobias apparently contacted a Las Vegas attorney, Howard Miller, at Cody's request. Tobias informed Cody that Miller would not come to the jail that evening unless Cody paid Miller a $1,000 retainer. Cody was unable to retain Miller. Shortly after the interview was concluded, Tobias then telephoned John Hughes, an attorney in Sturgis, South Dakota, at Cody's request. According to Cody, he

talked to Hughes for approximately three minutes.[1] There is a conflict as to whether Tobias was privy to this conversation or what matters were discussed. * * * [S]hortly after talking to Hughes, Detective Santongue obtained from Cody a signed consent to search his room at the Aladdin Hotel, which he had earlier refused. The search resulted in uncovering incriminating evidence against him.

Cody was given his *Miranda* warnings at the outset of the aforementioned February 28th interview.

## ISSUES

### I.

Did the trial court err in ruling that Cody's constitutional rights were not violated when he consented to a search of his room? We hold that it did not.

### II.

Was Cody denied due process due to the State's failure to produce certain alleged exculpatory evidentiary items? We hold that he was not.

### III.

Is SDCL 16–13–42 unconstitutional as violative of due process? We hold that it is not.

### IV.

Was Cody denied due process by the fact that his illegally obtained statements could have been admitted into evidence by the State for impeachment purposes if Cody had testified contrary to these statements? We hold that he was not.

### V.

Was there sufficient evidence presented at trial to support the verdict of guilty? We hold that there was.

---

1. Following the reversal of *Cody I*, Hughes testified at the motion to suppress hearing that his conversation with Cody lasted approximately twenty to twenty-five minutes and that he did not recall discussing with Cody anything with regard to a consent to search. Hughes did state, however, that he advised Cody to remain silent.

## DECISION

### I.

Cody contends that the trial court erred when it denied his motion to suppress certain incriminating articles which were found in his Las Vegas hotel room. Authorities entered the room pursuant to Cody's written consent. Cody was apprised of his constitutional rights and the consent form was read to him several times before he consented to the search. Prior to relinquishing his consent, however, Cody mentioned that there was something in his room which he felt would incriminate him. When asked what it was, he responded, "narcotics." After he was assured that no criminal charges would be brought against him with respect to any narcotics taken from his room pursuant to the search, Cody signed the consent form.

This Court held in *Cody I* that Cody's consent to search had been given freely and voluntarily. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Kissner*, 252 N.W.2d 330 (S.D.1977). Here, however, Cody contends that his Fifth Amendment rights were violated when, subsequent to *Miranda* warnings and the advice of counsel, authorities requested his consent to search. The marrow of Cody's position is that a request for consent to search is the legal equivalent of an interrogation since both procedures are designed to obtain evidence from a defendant and, accordingly, such a request cannot constitutionally occur without first affording the accused access to counsel.

In *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 307–308 (1980), the United States Supreme Court held:

> . . . *Miranda* safeguards. come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the

term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [5] from the suspect.

Footnote five in *Innis* stated (emphasis in original): "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. * * *" *Id.* The Court in *Innis* elaborated further: "But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301–302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308 (emphasis in original). *See also United States v. Hinckley*, 30 Crim.L.Rep. (BNA) 2425 (March 10, 1982).

It is not necessary to address the question of whether a request to consent falls under the purview of *Innis*[2] for, under the facts of this case, we believe that Cody had been provided with counsel prior to consenting to the search.

The United States Supreme Court has recently expounded upon the principles of *Innis* in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct.. 1880, 68 L.Ed.2d 378 (1981). *Edwards* involved a defendant who, after being arrested, incarcerated, and given his *Miranda* warnings, was immediately questioned by police until he requested an attorney. The interrogation then ceased and the defendant was given the telephone number of a county attorney. The defendant made the call to this county attorney, a prosecutor, but hung up after a few moments. *Id.* at 1882. On the following day, the defendant was again questioned by police after

2. Courts have reached varying results in determining whether a defendant is entitled to the advice of counsel prior to consenting to a search. *See United States v. Fisher*, 329 F.Supp. 630 (D.Minn.1971); *People v. James*, 19 Cal.3d 99, 137 Cal.Rptr. 447, 561 P.2d 1135 (1977); *People v. Thomas*, 12 Cal.App.3d 1102, 91 Cal.Rptr. 867 (1970); *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975); *People v. Johnson*, 48 N.Y.2d 565, 423 N.Y.S.2d 905, 399 N.E.2d 936 (1979).

being re-advised of his *Miranda* rights but without access to counsel. *Id.* at 1886. This time the defendant confessed to the crimes charged. The Court held that the defendant was subjected to custodial interrogation within the meaning of *Innis* and that this occurred at the instance of authorities. Thus, the Court concluded that since the defendant's confession was made without having had access to counsel and there was no valid waiver of his right to counsel, the confession was unconstitutionally obtained.

Our primary consideration, then, must be whether Cody had access to counsel at the time he consented to the search. As previously mentioned, we believe that he had. As stated under *FACTS*, Cody telephonically spoke with Attorney John Hughes for, according to Hughes, twenty to twenty-five minutes.[3] During this conversation, Hughes advised Cody to remain silent. Thereafter, the attending authorities requested Cody's consent to search which, after being assured that narcotic-oriented charges would not be brought against him, he relinquished. When his consent was requested, Cody did not indicate to the authorities in any manner that he wished to consult further with counsel.

In *Edwards v. Arizona*, supra, it appears that the Court did not believe that the police had allowed the defendant any access to counsel. Here, however, Cody opted to consult with out-of-state counsel by telephone and had access to counsel's advice for twenty to twenty-five minutes. Even though Attorney Hughes was not personally present when the consent was requested, Cody had, in fact, availed himself of competent legal advice and counsel prior to the consent being given. Furthermore, as we held in *Cody I*, nothing prevented Cody from refusing to acquiesce to the request; that is, his consent was given freely and voluntarily 'as per the dictates of *Schneckloth v. Bustamonte,* supra, and *State v. Kissner,* supra. Attorney Hughes had impliedly directed Cody to refuse consent by

advising him to remain silent. It is clear that by consenting to the search, "Cody took a calculated risk." *Cody I* at 451. *See Gautreaux v. State,* 52 Wis.2d 489, 190 N.W.2d 542 (1971). Cody obviously thought that the money belonging to the victim, which he had ingeniously hidden in a wall, could not be found by the authorities. His risk was foiled by its discovery.

 A careful reading of *Edwards* indicates that once a defendant has invoked his right to counsel, any subsequent waiver of that right must be made knowingly, intelligently and voluntarily. *See Stumes v. Solem,* 671 F.2d 1150 (8th Cir. 1982). Under the unique scenario herein involved, we are convinced that Cody met these prerequisites to a valid waiver of right to counsel prior to consenting to the search of his hotel room. The situation in *Edwards* is simply not analogous with the case presently before us which would justify a holding that Cody's consent was unconstitutionally obtained.

We therefore hold that the facts here sufficiently indicate that Cody was granted his Sixth Amendment right to counsel prior to consenting to the search of his room, and his consent to search was given freely and voluntarily. Thus, the trial court's denial of the motion to suppress was not erroneous.

## II.

Secondly, Cody contends that he was denied due process by the State's inability to produce a road atlas, gas receipts, and several minicassettes which were allegedly in the State's possession. At the pre-trial omnibus hearing, Cody motioned for the State to produce these items. The State responded by arguing, in essence, that it had made available to the defense all evidence in its possession; the State further agreed to recheck with Las Vegas authorities to make sure that all applicable evidence was available. The trial court ordered the State to allow Cody access to any evidentiary materials it may have which it had not already

---

**3.** We are cognizant of the fact that there was some evidence to the effect that criminal investigator Marc Tobias was privy to a portion of the conversation.

produced. The State, however, was still unable to locate the items in question.

■ The suppression of evidence favorable to an accused, upon request, violates due process where the evidence is material to either guilt or punishment irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Wilde*, 306 N.W.2d 645 (S.D.1981); *State v. Parker*, 263 N.W.2d 679 (S.D.1978). We held in *State v. Reiman*, 284 N.W.2d 860 (S.D.1979), that not every failure to produce evidence under court order will require reversal, for "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342, 350 (1976).

In *Marshall v. State*, 305 N.W.2d 838 (S.D.1981), this Court rejected the defendant's contention that a reversal was required due to the prosecution's failure to comply with the trial judge's order to produce medical records of a witness whose testimony strongly implicated the defendant as a murderer. "In view of the strong circumstantial evidence of guilt presented at the murder trial, we cannot say as a matter of law that the medical records of [the witness] would have been outcome-determinative in this case." *Id.* at 843.

■ We have carefully reviewed the alleged exonerating effect of the missing items in conjunction with the evidence presented at trial and do not believe that the items, if produced, would have altered the ultimate verdict of the jury.

### III.

Third, Cody contends that SDCL 16–13–42 is unconstitutional as violative of due process. SDCL 16–13–42 provides:

If all persons summoned as grand and petit jurors do not appear before the court, or if for any cause the panel of grand or petit jurors is not complete, or if no jury is drawn as provided by §§ 16–13–27 and 16–13–28, the court may order the sheriff, deputy sheriff or coroner to summon without delay persons having the qualifications of jurors, whose names appear upon the master jury list, and if the jury list is exhausted then from the reserve envelopes referred to in § 16–13–17 and if both the master jury list and the list of selected jurors held in reserve are exhausted then from other residents of the county. The person or persons summoned shall forthwith appear before the court, and if competent shall serve on the grand or petit jury as the case may be unless excused or lawfully challenged.

Cody argues that due to the coroner's and deputy sheriff's prior involvement in this case, they were unable to objectively summon additional potential jurors after the original pool of potential jurors had been exhausted.

■ Enactments of the Legislature will be upheld unless they are clearly and unmistakably unconstitutional. *State v. Crelly*, 313 N.W.2d 455 (S.D.1981); *Direct Auto Buying Service, Inc. v. Welch*, 308 N.W.2d 570 (S.D.1981); *People In Interest of T. L. J.*, 303 N.W.2d 800 (S.D.1981).

In *State v. Rodden*, 86 S.D. 725, 201 N.W.2d 232 (1972), this Court upheld the constitutionality of a similar provision, SDCL 16–13–43, which provides:

Whenever the panel of petit jurors shall be exhausted by the challenges of either party in any action, the judge of the court shall order the sheriff, deputy sheriff, or coroner to summon, without delay, a sufficient number of persons possessing the qualifications of jurors to complete the number requisite for a jury in that particular case.

In *Rodden* we quoted with approval the following language from *People v. Kelhoffer*, 181 Misc. 731, 48 N.Y.S.2d 771, aff. 292 N.Y. 622, 55 N.E.2d 503 (1944):

What the Constitution secures to a defendant is the right of trial by an impartial jury as constituted at Common Law, and, when the right is secured, the defendant's constitutional protection is completely secured. The mode of procuring and of impanelling a jury is regulated by

such laws as the Legislature may see fit to enact with respect to method of procedure * * *.

*Rodden*, 86 S.D. at 726–727, 201 N.W.2d at 233–234.

Further, in *State v. Reiman*, supra, we held that "[i]n the absence of any showing that the defendants were prejudiced by the sheriff's participation in the statutory selection process, their argument is without merit." *Id.* at 868; *see also Thompson v. White*, 661 F.2d 103 (8th Cir. 1981); *Henson v. Wyrick*, 634 F.2d 1080 (8th Cir. 1980).

■ The trial court specifically instructed the county coroner and the deputy sheriff to only obtain potential jurors who presented qualities of objectivity. Also, the nexus between the substance of the State's case and the county coroner and deputy sheriff is limited at best. No deviations from the provisions of SDCL 16–13–42 are either alleged or indicated. We hold that SDCL 16–13–42 is not unconstitutional.

### IV.

Cody fourthly contends that the incriminating statements he made to authorities which were not placed into evidence as per our holding in *Cody I* chilled his ability to testify on his own behalf in that, had he testified, the State might have then used the unconstitutionally obtained statements for the purpose of impeachment.

■ It has been established that confessions illegally obtained may be used for impeachment purposes. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). "[T]he shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 1221, 43 L.Ed.2d 570, 577–578 (1975).

As the Supreme Court of Nebraska stated: "Under such circumstances it is for the defendant to decide whether or not he should testify. He has not been deprived of his constitutional right to testify, but has voluntarily elected not to." *State v. Es-*

*camilla*, 195 Neb. 558, 559, 239 N.W.2d 270, 271 (1976). *Contra State v. Santiago*, 53 Hawaii 254, 492 P.2d 657 (1971).

■ Consistent with the United States Supreme Court, we hold that Cody was not denied due process by the potential use of illegally obtained statements for the purpose of impeachment.

### V.

■ Lastly, Cody maintains that there is insufficient evidence to support the verdict and sustain the conviction. In determining the sufficiency of evidence on appeal, the question presented is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Vogel*, 315 N.W.2d 321 (S.D.1982); *State v. Robb*, 303 N.W.2d 368 (S.D.1981); *State v. Moeller*, 298 N.W.2d 93 (S.D.1980); *State v. Dietz*, 264 N.W.2d 509 (S.D.1978); *State v. Shank*, 88 S.D. 645, 226 N.W.2d 384 (1975). In making such a determination, this Court will accept that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict. *State v. Moeller*, supra; *State v. Dietz*, supra; *State v. Best*, 89 S.D. 227, 232 N.W.2d 447 (1975).

■ We recognize that a considerable part of the State's case was based on circumstantial evidence. All elements of a crime, including intent, however, can be proven by circumstantial evidence. *State v. Moeller*, supra; *State v. Shank*, supra; *State v. Rober*, 86 S.D. 442, 197 N.W.2d 707 (1972); *State v. Peck*, 82 S.D. 561, 150 N.W.2d 725 (1967). Upon a review of all the evidence which was presented to the jury, we cannot say that it was insufficient to support the verdict.

■ During the pendency of this appeal, Cody moved this Court to amend the judgment of the trial court so as to allow credit for his continuous period of incarceration (due to indigency) which preceded the judgment of conviction. Although an indigent is to receive credit for jail time served while awaiting trial, *see State v. Lohnes*, 266

N.W.2d 109 (S.D.1978) and *King v. Wyrick,* 516 F.2d 321 (8th Cir. 1975), granting such credit on a life sentence is obviously futile.

The judgment of the trial court is affirmed.

All the Justices concur.