STATE of South Dakota, Plaintiff
and Appellee,

v.

Blaine John BRINGS PLENTY,
Defendant and Appellant.

Nos. 16613, 16636.

Supreme Court of South Dakota.

Argued Jan. 8, 1990.

Decided July 11, 1990.

M. Bridget Ryan, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

James F. Margadant of Seiler and Trimble, Rapid City, for defendant and appellant.

MORGAN, Justice.

Blaine Brings Plenty (Blaine) appeals a judgment rendered on a jury verdict convicting him of second-degree murder arising from the death of Chris Janis (Janis). We reverse and remand.

Blaine's niece, twelve-year-old Lori Brings Plenty (Lori), testified unequivocally about the events which took place on the evening of January 9, 1988, and the early morning hours of January 10, 1988. At the time, Lori was living with her grandmother, Vera Brings Plenty (Vera), at 12 Neptune in Rapid City, South Dakota. What follows is a summary of the background facts as shown by the record. Additional facts will be supplied, where relevant, to the discussion of each of the issues.

Lori testified that on January 9, 1988, the Brings Plenty family attended a birthday party at the neighboring Black Tail Deer trailer. Alcohol was served and consumed by all, except Lori. After the party, the Brings Plenty family, co-defendant Robert Tapio (Tapio), and the victim Janis repaired to the Brings Plenty trailer at 12 Neptune. Tapio, who was a boyfriend of Ollie Brings Plenty (Ollie) at the time, became jealous of Janis. Blaine and Janis got into an argument and fist fight, which eventually moved outside the trailer. Lori observed the fist fight from the window for about fifteen to twenty minutes. Tapio, at some point, joined the fight. Cameron Red Star (Red Star) and Millard Brings Plenty (Millard) attempted to stop the fighting. When their efforts proved fruitless, Red Star ran

to call the police as things were "getting out of hand." Blaine and Tapio stopped beating on Janis in order to chase after Red Star to prevent him from calling the police. Red Star was caught approximately two trailers down from 12 Neptune and severely beaten by Tapio and Blaine.

Meanwhile, Vera and Ollie helped Janis back into the trailer and locked the door. Tapio and Blaine returned to the trailer and began kicking and pounding on the door. Eventually, the door was opened, at which time Tapio and Blaine dragged Janis back outside to the bottom of the steps. Vera and Ollie's efforts to stop the two were futile. At the bottom of the steps, Tapio and Blaine proceeded to severely beat Janis. Blaine told Tapio to get two "sticks," which were in the yard. Tapio complied with the request and both proceeded to bludgeon Janis repeatedly with the "sticks," which were actually 2″ × 2″ or 2″ × 6″ boards (hereinafter clubs). Janis was struck all over his body, including his legs, back, sides, and head. Lori heard Tapio say, "Kill the son of a bitch." She testified that Blaine kept hitting Janis. Vera and Lori finally ran to the neighbors to call the police.

The 911 call was received by Dispatcher Laurie Greeley, Dispatcher of the Pennington County Law Enforcement Office, and was logged at 12:10 a.m., January 10th. The Dispatcher testified that Vera was screaming and hysterical. Several times she stated "They're killing him." Vera also screamed out the names "Tapio," "Chris Janis," and "Blaine." Eventually, the Dispatcher established that Janis was the victim who was being assaulted with clubs. Although she could not clearly decipher Blaine's part in the attack, the Dispatcher understood that Tapio was one of the attackers.

Pursuant to a radio dispatch, Officer Nelva Blenner (Blenner) was the first to arrive on the scene. Blenner first observed Vera running towards her. Vera was excited and yelling. Blenner also observed Red Star lying on the sidewalk. Red Star, who is Vera's son, was covered with blood and still bleeding. After assuring Vera that her son would be okay, Vera pointed out a second body which was lying near the trailer steps. While Blenner was observing the second body, Officer Monte Nelson (Nelson) arrived and joined Blenner. The second victim, who was lying in a pool of his own blood, was Janis. Janis appeared to have large gashes on his head and was bleeding profusely from the back of the head, his mouth, and his nose. Nelson observed Janis' left arm cocked underneath his body. A club was lying across the arm. The club was moved and set aside by Nelson because he could not tell whether it was impaled in Janis. Nelson noted a similar club lying a few feet from the body. Both clubs had human blood and hair on them. Janis and Red Star were subsequently transported to the hospital by ambulances.

Meanwhile, the officers continued their investigation. Vera told Blenner that "the guys who did it were inside." Both officers proceeded to go inside the trailer with Vera, wherein they observed Leo Brings Plenty, Millard, Blaine, Tapio, and Ollie. Blaine was seated at the kitchen table and Tapio was in the kitchen area. Once inside, Vera pointed to Tapio and Blaine and stated "they both did it." Blenner, who had noticed blood on Tapio's shoes, arrested Tapio. Nelson arrested Blaine. While in the trailer, Nelson had observed a large bloodstain on Blaine's left pant leg, and on his hands and face.

Janis died approximately one week later due to massive brain swelling that was the result of the trauma he had sustained to his head. Blaine was charged by Information with four alternative homicide counts: (1) premeditated first-degree murder (SDCL 22–16–4); (2) second-degree murder by acts imminently dangerous to others and evincing a depraved mind (SDCL 22–16–7); (3) first-degree manslaughter in a heat of passion, but in a cruel and unusual manner (SDCL 22–16–15(2)); and, (4) first-degree manslaughter by means of a dangerous weapon (SDCL 22–16–15(3)).

The jury returned a guilty verdict on the second-degree murder count for violation of SDCL 22–16–7. Blaine was sentenced to

serve life without parole in the state penitentiary.

On appeal, Blaine raises nine issues and State raises one issue by notice of review, to-wit:

1.  Whether the trial court abused its discretion in admitting

    a) Blaine's statement made in the presence of Officer Nelson;

    b) photos taken and evidence seized at the scene;

    c) evidence (hair and blood samples) seized from Blaine's person pursuant to a search warrant.

2.  Whether the trial court erred in allowing impeachment of Blaine by his custodial statements to Detective Egan, which had been suppressed because the trial court found them to be in violation of Blaine's *Miranda* rights and involuntary. In conjunction with this issue, we will discuss State's notice of review issue, whether the trial court erred in excluding the use of Blaine's post-*Miranda* statement to Detective Egan in the State's case-in-chief.

3.  Whether the trial court erred in permitting impeachment of Vera Brings Plenty by statements made in conversation with Officer Blenner.

4.  Whether there was sufficient evidence in the record to justify an aiding and abetting instruction.

5.  Whether the trial court erred in not instructing the jury on the lesser included offenses of second-degree manslaughter and aggravated assault.

6.  Whether the trial court abused its discretion in denying a motion for mistrial because three jurors might have seen Blaine in handcuffs and shackles in violation of a court order.

7.  Whether there was sufficient evidence to support the verdict.

Because our disposition of Blaine's second issue and the State's notice of review issue mandates a new trial, we will deal with those issues first.

## 2. INVOLUNTARY STATEMENT FOR IMPEACHMENT

The background for this issue is that Blaine, when advised of his *Miranda* rights by Officer Nelson during the early morning hours of January 10th, declined to waive those rights and talk to the police. Nelson so indicated in his report to his superior officer. Later in the day, Detectives William Egan (Egan) and Bonnie Feller–Hagen brought Blaine to a small interrogation room at the Pennington County Jail. They were apparently unaware of Blaine's earlier action. Egan began the interrogation and made some attempt to give Blaine a *Miranda* warning.

After a pretrial hearing, the trial court suppressed Blaine's statement for use in State's case-in-chief for the reason that under the totality of the circumstances it was involuntary. However, the trial court, relying on *Harris v. New York*,[1] ruled that the statement could be used to impeach Blaine if he took the witness stand and testified in a manner inconsistent with the statement. It is Blaine's contention that the trial court's ruling allowing use of the statement for impeachment denied him due process. By notice of review, State argues that the trial court erred in suppressing the statements to any extent.

We first reject State's argument that Blaine waived this issue because he did not elect to take the witness stand to testify. The reliance on *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), is misplaced. *Luce* does not stand for the proposition that Fifth Amendment confession issues are waived if a defendant does not take the stand. The Court specifically distinguished its ruling from Fifth Amendment cases because it was dealing with impeachment with a felony conviction under Rule 609 of the Federal Rules of Evidence. 469 U.S. at 42, 43, 105 S.Ct. at 464, 83 L.Ed.2d at 448. Nor does *State v. Means*, 363 N.W.2d 565 (S.D.1985), or *State v. Dickson*, 329 N.W.2d 630 (S.D.1983), stand for the proposition that a defendant waives a confession issue

---

1.  401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

by not testifying. Both *Means* and *Dickson* involved potential impeachment with prior *felonies, not confessions*. Again, we are not willing to accept State's argument that a defendant waives a constitutional defect in making a confession when he does not testify.

Turning then to the merits of the suppression issue, State seems to argue that the trial court's decision on the suppression motion rested solely on the failure to adequately give the *Miranda* warning. We disagree. Granted, the record is somewhat murky because the trial court chose to enter the findings of fact and conclusions of law by simply incorporating its memorandum opinion. The trial court did not even attempt to clearly set out findings and conclusions, leaving this court with the task of sorting them out. We disagree with State's interpretation of the record.

As we read the trial court's memorandum opinion, we glean the following findings:

1. Egan failed to inform Defendant of his constitutional rights at the outset of the questioning.
2. Egan first went through a psychological process of minimizing the act.
3. Egan offered the legal excuse of self-defense.
4. Egan said Janis was not dead although he knew the prognosis was that he would not recover.
5. Egan minimized the importance of the *Miranda* warning.
6. Egan offered some inducements of favorable recommendations in his talks with the state's attorney.
7. After all the foregoing, Egan advised the defendant in some form of the *Miranda* warning.
8. The *Miranda* warning given was deficient in two aspects: first, defendant was not informed that he had the right to the physical presence of an attorney prior to any questioning and, second, he was not advised that he could terminate questioning at any point he wished.

From the memorandum opinion we also glean the following conclusions of law:

1. The psychological inducements referred to in *Miranda, together with the fact* that the *Miranda* warnings were not given at the outset and further were not given in plain and unequivocal language, makes any statements offered involuntary under the totality of circumstances.
2. All statements made to Detective Egan by the defendant, are suppressed for the reason that under the totality of the circumstances, they are involuntary.
3. Because these statements were in violation of *Miranda*, but not in violation of the defendant's Sixth Amendment right to counsel, they can be used for impeachment, should the defendant take the witness stand.

The record clearly supports the trial court's findings regarding the psychological processing or softening up that Egan engaged in. If the Rapid City Police Department does not supply its officers and detectives with a standard *Miranda* warning card, it should, and the officers should use them.

■■■ We are not completely in agreement with the trial court's findings in regard to the *Miranda* deficiencies. *California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696, 701 (1981), instructs us that *Miranda* does not require a precise formulation of the warnings given a criminal defendant or a "talismanic incantation," but rather that the warning reasonably convey to a defendant his rights as required. In our view, the language used by Egan: "You have the right to consult with and the presence of an attorney" satisfies the requirement that Blaine be advised of the right to have an attorney present prior to any questioning. The fact that Egan had begun the questioning before stating the right, and testified later that he would not know how to get Blaine an attorney at that point if he had requested one, go to the form of the warning, not the substance thereof. To that extent, we disagree with the trial court's ruling. But it is clear that Blaine was not advised that

he could terminate the questioning at any point that he wished; thus, there was a deficiency in the substance of the *Miranda* warning given, as well as the form.

■ In basing its decision on use for impeachment on *Harris*, the trial court misconstrued that decision. *Harris* stands only for the proposition that a defendant may be impeached with a *voluntary* statement obtained without proper *Miranda* warnings. *Harris*, 401 U.S. at 225, 91 S.Ct. at 646, 28 L.Ed.2d at 4. Having stated as a legal conclusion that the statement was involuntary, *Harris* is totally inapplicable. A statement obtained merely in violation of a *Miranda* warning is not involuntary, but *inadmissible* because a suspect's rights against compulsory self-incrimination under the Fifth Amendment are violated. *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222, 232 (1985). But, a statement that is procured by overbearing a suspect's free will is coerced and involuntary, thereby violating a suspect's constitutional Fifth Amendment and Fourteenth Amendment rights to due process. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

*New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979) (citation omitted) (footnote omitted), the United States Supreme Court reiterated its ruling in *Mincey*, that

> [A] defendant's *compelled* statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial. 'But any criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.' (Emphasis in original.)

Further, in *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908, 915 (1964) (citation omitted), the Court held:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside

from the confession to support the conviction.

The issue then becomes: Was the trial court clearly erroneous in finding that the statements were involuntary? Our scope of review on voluntariness of confessions has recently been reaffirmed by a majority of this court in *State v. Jenner*, 451 N.W.2d 710 (S.D.1990), wherein it is said:

> The State has the burden of proving beyond a reasonable doubt that such confessions or incriminating statements were freely and voluntarily made. If the trial court finds the confession or incriminating statement was voluntary beyond a reasonable doubt, such finding is binding upon this Court unless we conclude from our review of the record that the finding is clearly erroneous. The trial court must have reviewed the totality of the circumstances surrounding the interrogation. In reviewing the trial court's findings on voluntariness, we consider the evidence in the light most favorable to the finding.

451 N.W.2d at 716 (citations omitted). Although *Jenner* affirmed a trial court's finding of voluntariness, the same scope of review obviously applies to this trial court's finding of involuntariness.

■ Here, the trial court found that Egan used psychological inducements to persuade Blaine to make statements. From the outset, Egan made it clear that he had influence with the state's attorney: "I'll sit down and tell him that I talked to Blaine and Blaine sat down and talked to me and told me the truth, cause that's important." But, after using psychological inducements such as suggesting self-defense was available and that Janis was still alive even though he knew the prognosis was that Janis would die, Egan made it clear that the version of the "truth" he wanted to hear was that Blaine and Tapio beat Janis. It was Egan who used leading questions to suggest that Blaine was the one who beat Janis with a 2″ × 6″ board:

> Q Okay everybody says that you had a two by six in your hand and that you were hitting Chris with a two by six, but that was after he beat you.

A   Yeah?

Later, when Blaine was saying that he did not know who was assisting in the beating, Egan made it clear that that version of the "truth" would not go over well with the state's attorney:

Q   You know who he is, was he the guy that helped you out?

A   I don't think so.

Q   Who helped you out?

A   I don't know.

Q   Blaine....

A   I don't know what happened there.

Q   Blaine, when I go to the State's Attorney's Office tomorrow I'm gonna tell them that you just sat here and lied through your teeth cause that's exactly what your're doing.

A   I don't know man.

██   We cannot say that the trial court was clearly erroneous in deciding that, under the totality of the circumstances, Egan's inducements and threats overbore Blaine's free will and caused him to make an involuntary statement.[2] *Mincey, supra; Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (defendant held incommunicato and denied right to see counsel and wife until he produced statement police wanted). We find the trial court did not err in suppressing Blaine's statement for the case-in-chief, but it did err in allowing State to use this statement for impeachment purposes, thereby denying Blaine due process of law. *Mincey, supra.* We are therefore required to reverse and remand for a new trial.

Because we anticipate that the issues raised by Blaine as issues 1 and 3 will likely recur at the retrial of this case, we also dispose of them.

### 1. ABUSE OF DISCRETION

(a) Statements Made to Officer Nelson

After the beating of Janis and the arrival of the Rapid City Police, Officer Nelson arrested Blaine and placed him in a patrol car. Blaine then became extremely violent, pounding on the windows and yelling; whereupon, he was removed from the car, handcuffed, returned to the car, and subsequently transported to the Pennington County Jail by Officer Nelson. Nelson did not ask Blaine any questions. A family by the name of "Tuttle" lived along the route taken by Nelson. *Before* the vehicle reached the Tuttle residence, Blaine was mumbling "Kill 'em, Kill them, Kill the fuckers." Blaine made other mumblings, some of which Nelson could understand and some of which he could not. As the vehicle reached the Tuttle residence, Nelson heard Blaine say something about "Tuttles" and then he continued making statements about killing. No references were made to the Tuttles prior to the vehicle reaching the Tuttle residence. Nelson opined that Blaine was very intoxicated at this time. Nelson did not read Blaine his *Miranda* warnings until he reached the Pennington County Jail.

Blaine now argues that these statements were involuntary because they were made while he was in custody without *Miranda* warnings. As an alternative theory, he argues that even if the statements were voluntary, they should not have been admitted because they were not relevant and were unfairly prejudicial. We disagree as to all three objections.

██   As to the lack of *Miranda* warning, we first point out that the United States Supreme Court decision in *Miranda, supra,* protects a defendant from the use of statements made during custodial interrogation if he is not given the appropriate warnings as to waiver of his rights. Merely being in custody does not trigger the need for *Miranda* warnings. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). There must be "some officially coerced self-accusation, [otherwise] the Fifth Amendment privilege

---

**2.** Were we able to apply the federal "plenary review," suggested by the dissent in *State v. Jenner,* 451 N.W.2d 710, 726 (S.D.1990) (Morgan, J., dissenting), the outcome in this case would undoubtedly be different. Under "plenary" review, because the issue of voluntariness is a mixed question of law and fact, it is viewed as a question of law. Here, the trial court is correct in its assessment of the facts, however, the synergistic evil spoken of in the *Jenner* dissent is not present.

is not violated by even the most damning admissions." *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 245 (1977).

Here, Nelson did not ask Blaine any questions, nor was any kind of coercion applied. Simply put, there was no government action that triggered the need for *Miranda* warnings. *Washington, supra; Innis, supra.*

█ Second, Blaine alleges that the statements about "killing" were not relevant and were unfairly prejudicial because they were made in the plural and could have been about the Tuttle family. State argues that Blaine waived this issue because he did not object below. Alternatively, State claims the probative value outweighed any unfair prejudice.

State's waiver argument is not well taken on the clear record. Blaine timely moved to suppress his statements before trial on the grounds of relevance and lack of trustworthiness. After the trial court filed its memorandum opinion regarding the suppression of the statements to Nelson, Blaine's counsel filed proposed findings of fact and conclusions setting out that the statements were not relevant or trustworthy. Finally, at trial, Blaine's counsel objected to the statements at the time they were offered on foundational grounds *and on all other grounds that he had previously stated to the court.* We find it difficult to conceive how Blaine could have done anything further to protect his record. The cases cited by State are likewise distinguishable because, in those cases, no objection was in fact made at trial. *State v. Novaock,* 414 N.W.2d 299 (S.D.1987); *State v. Olson,* 408 N.W.2d 748 (S.D.1987); *State v. Dace,* 333 N.W.2d 812 (S.D.1983) *reh'g denied* (June 6, 1983). We believe that Blaine's counsel adequately preserved the issue for appeal.

█ Accordingly, we examine the merits of Blaine's claims. Before we may reverse the trial court on this issue, Blaine must demonstrate that the trial court abused its discretion in admitting the evidence. *State v. Menard,* 424 N.W.2d 382 (S.D.1988). Blaine's contentions require us

to examine two issues: (1) were the spontaneous statements relevant and, if so, (2) was their probative value outweighed by the danger of unfair prejudice. Generally, evidence is relevant if it tends to make the existence of any fact at issue more probable or less probable than it would be without the evidence. SDCL 19–12–1; *State v. Pedde,* 334 N.W.2d 41, 42 (S.D.1983); *State v. Johnson,* 316 N.W.2d 652, 654 (S.D. 1982). Any fact that tends to connect Blaine to the commission of the crime is relevant. *Johnson, supra; State v. Reutter,* 374 N.W.2d 617, 625 (S.D.1985).

█ Here, the evidence is relevant. The spontaneous statements, "Kill them," "Kill 'em," and "Kill the fuckers," made shortly after Janis was severely beaten, were relevant to show Blaine's premeditated design to kill, an element of the offense of first-degree murder, SDCL 22–16–4. *State v. McDowell,* 391 N.W.2d 661, 667–68 (S.D.1986); *State v. Huber,* 356 N.W.2d 468 (S.D.1984). They also tend to show the beating took place while Blaine was in the heat of passion, one of the elements of first-degree manslaughter. On either ground, the statements make it more probable than not that Blaine committed the crimes charged. *Pedde, supra; Johnson, supra.*

Further, the statements were relevant to show Blaine was involved in causing the death. Some of the witnesses tried to limit Blaine's involvement in Janis' beating and shift the blame to Tapio. The statements made by Blaine thus tend to make it more probable that Blaine was involved in the beating of the victim and that he intended to kill him. As such, the statements were relevant and highly probative.

█ We then examine the second step. Even though relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. SDCL 19–12–3; *Means, supra* at 568; *State v. Wedemann,* 339 N.W.2d 112, 115 (S.D.1983). We are not persuaded that the probative value was outweighed by unfair prejudice because "killing" was discussed in the plural or because the Tuttles were

mentioned. There is evidence that Red Star attempted to intercede on Janis' behalf by calling the police and was beaten by Blaine. Considering the number of combatants involved in the strife, it was not illogical to discuss killings in the plural. As to any reference to the Tuttles, we find that unpersuasive. Notably, these mutterings began *before* the patrol car reached the Tuttle residence. Though mention of "killing" also took place after seeing the Tuttles' residence, any unfair prejudice was precluded by the extensive cross-examination of Officer Nelson. Jurors were thereby apprised that Blaine was drunk at the time and nature of *all* of Blaine's utterances.

█ Just because the statements were harmful to Blaine does not mean they were unfairly prejudicial. Unfair prejudice means evidence that has the capacity to persuade by illegitimate means. *State v. Holland,* 346 N.W.2d 302 (S.D.1984); *State v. Iron Shell,* 336 N.W.2d 372, 375 (S.D. 1983). Here, the probative value of the statements to prove elements of premeditation and heat of passion were not substantially outweighed by any unfair prejudice to Blaine. *State v. Rose,* 324 N.W.2d 894 (S.D.1982).

### (b) Evidence and Photos Taken at the Scene

Approximately an hour after the original police response, Detective Harold Plooster (Plooster) arrived at 12 Neptune. Several officers were there protecting the scene at this time. Officers Nelson and Burdick told Plooster what had happened. They showed him the yard area and the inside of the trailer. Several people were in the trailer, including Millard, Lori, Ollie, Leo and Vera. While briefly looking inside the trailer, Plooster saw a wood splinter and earring on the kitchen floor and picked them up. Plooster then went outside and took some photographs. Plooster came back inside the trailer. At this time, Plooster asked Vera for permission to search additional areas of the trailer and she agreed. This search produced, in part, a club found in the bedroom closet of the middle bedroom and a wet bed covering taken from the middle bedroom. Photographs were taken before and after the additional oral consent was given. Later that morning (at approximately 6 a.m.), Plooster asked Vera to sign a permission-to-search form. Vera read and signed the consent form and Ollie signed as a witness to it.

Blaine made a pretrial motion to suppress all the evidence collected at the scene. He alleged that the evidence should have been suppressed as the fruit of a warrantless search of the trailer house (his home), and of the curtilage. The trial court denied the motion to suppress, ruling that the physical evidence seized outside the trailer was appropriately seized because the items were in plain view and that the searches inside were conducted with the consent of Vera, the actual lessee of the premises.

█ Our scope of review on a motion to suppress is whether the trial court abused its discretion. *State v. Bartlett,* 411 N.W.2d 411, 414 (S.D.1987). As to any factual determinations, our scope of review is the clearly erroneous standard. *State v. Woods,* 374 N.W.2d 92 (S.D.1985). On appeal, this court must determine whether the trial court's findings are against the weight of the evidence. *Id.*

We first examine the arguments relative to the search of the trailer. It is a well-recognized exception to the warrant requirement that a party may give consent to a search. *Woods, supra,* at 99–100 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.E.2d 854 (1973)). Furthermore, consent may be given by a third person who has "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974) (footnote omitted).

Whether consent to search has been voluntarily given "is a question of fact to be determined from the totality of the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 862; *Woods, supra.* State has the burden of showing

voluntariness by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied. *Id.*

The initial search was occasioned when Vera summoned police to 12 Neptune by a 911 call for help because someone was being killed. She directed police into the trailer to find "the guys who did it." Once inside, she identified Blaine and Tapio as the assailants. Vera's words and conduct clearly invited police officers to enter her home and investigate. *Woods, supra.* Plooster testified that he updated the earlier consent given to Officers Nelson and Blenner when he arrived at the scene. Plooster specifically asked Vera if he could look around the trailer and she agreed and ultimately signed the written consent.

Blaine contends that Vera's consent to the search was nonconsensual because she was subjected to misrepresentations and intimidation and because she was given the impression that she had no alternative but to sign the consent form at 6 a.m. The record does not indicate that anyone exerted physical coercion or official pressure on Vera to make her sign the form, which she admitted that she had signed after reading the same. No threats were made or weapons shown. *State v. O'Brien,* 272 N.W.2d 69 (S.D.1978). The argument ignores all of her actions before signing the consent. Nor do we find a problem with the continuing search. No objection or revocation of consent was ever manifested by Vera. Finally, Vera testified that she read and executed the consent to search form which confirmed any earlier oral consent.

Under the totality of the circumstances, we do not find that the trial court abused its discretion in admitting this evidence. *Bartlett, supra.* All evidence seized and photos taken inside the trailer were admissible because of Vera's valid consent. *Matlock, supra; Schneckloth, supra; Woods, supra.*

We next examine the admissibility of the evidence seized outside the trailer. For all of the reasons stated with regard to the evidence seized in the trailer, anything observed or seized in the curtilage of the trailer at 12 Neptune is deemed admissible by Vera's consent. Vera's phone call and her subsequent actions constituted a consent to search the curtilage of 12 Neptune. *Woods, supra.*

Alternatively, the evidence seized in the curtilage was in plain view. In *State v. Martin,* 274 N.W.2d 893 (S.D. 1979) *cert. denied* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 112 (1979), this court found that evidence observed at the initial entry into a *residence* in an emergency situation was admissible. *See also State v. Bittner,* 359 N.W.2d 121 (S.D.1984). Here, shortly after the police arrived, the murder weapons (boards) were observed *outside* the residence. They were appropriately seized under the plain view exception. Likewise, the photographs of the scene were admissible as a mere continuation of the first search conducted pursuant to Vera's consent. *Martin, supra.*

### (c) Blood and Hair Samples Taken Pursuant to Warrant

Finally, we examine Blaine's arguments that the samples of his blood and hair, seized under a search warrant and later used at trial, should have been suppressed because the affidavit used to secure the warrant was defective. Detective Egan applied for the warrant on January 13, 1988. The affidavit stated generally that witnesses at the scene indicated that Janis had been beaten with a club, stick or piece of wood. Three witnesses, Millard, Lori and Vera had told Egan that they saw Janis being struck with clubs. Officers Blenner, Nelson, Anderson and Lynde had observed blood-stained clubs, with hair attached, lying near Janis' body. Egan further stated that Blaine and Tapio had been identified at the scene by witnesses as being the ones responsible for beating Janis with the clubs. Egan stated that, in an interview, Blaine had admitted fighting with Janis. Blood and hair samples were requested, granted, and presented at trial as Exhibits 64 and 67.

On appeal, Blaine claims that the search warrant should be voided because of material omissions in the affidavit in that: (1) Egan failed to tell the magistrate that the witnesses Millard and Vera were drunk and that witnesses gave conflicting statements, and (2) that Blaine's statement, in which he admitted being in a fight with Janis, was illegally obtained.

In *State v. Habbena*, 372 N.W.2d 450 (S.D.1985), we adopted the United States Supreme Court's two-part analysis for challenging "false statements" in a warrant affidavit. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The *Habbena* court stated:

"First, the defendant must show by a preponderance of the evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit. Second, the allegedly false statement must be necessary to the finding of probable cause."

372 N.W.2d at 456 (citations omitted). The Eighth Circuit has recognized that the *Franks* false statements test also extends to material omissions. *United States v. Dennis*, 625 F.2d 782 (8th Cir.1980) *reh'g and reh'g en banc denied* (July 29, 1980); *see generally* 2 LaFave, Search and Seizure § 4.4(b) (2d Edition 1987). The test set out in *Dennis* is:

The affidavit need only show facts sufficient to support a finding of probable cause. Therefore, omissions of other facts would not be misrepresentations unless they cast doubt on the existence of probable cause.

*Dennis*, 625 F.2d at 791 (citation omitted).

The question then becomes whether the alleged omissions would cast doubt on the existence of probable cause. First, the record only supports the fact that Vera had been drinking earlier, not that she was drunk at the time of the statements. Further, the record supports the fact that Lori had not indulged in any intoxicants and was not drunk. Even if we assume that the failure to tell the magistrate that Vera and Millard changed their story and claimed not to have known where Blaine was when Janis was beaten, we are still left with their original admissions to this fact. Indeed, if the magistrate had learned of their later recantations, he might well have believed their first admissions even more, since these were statements made in the excited time immediately after the event, rather than statements made after the damning nature of the evidence could be realized. Further, the fact that these original admissions were based on hearsay does not invalidate them. *State v. Hart*, 391 N.W.2d 677 (S.D.1986).

Most importantly, again, Lori never changed her story. The clear unassailed fact remains that she saw Blaine beat Janis with a club. Nor does anything change the fact that medical personnel said Janis was beaten with blunt objects, not inconsistent with clubs. Nothing contradicts the fact that blood-stained clubs were found at the scene near Janis. At the time of the preparation of the affidavit, Blaine's statement to Egan had not been surpressed as involuntary and for failure to properly give *Miranda* warnings. Thus, it could hardly be said that Egan intentionally omitted telling the magistrate anything about taking Blaine's statement. Even excising the allegations regarding the improper confession and supplying the omitted information about Vera and Millard, there still existed probable cause to issue the warrant. *Dennis, supra.*

### 3. IMPEACHMENT OF VERA BRINGS PLENTY

█ We next examine Blaine's argument that the trial court erred in permitting State to impeach Vera by statements that she had made to Officer Blenner. Called as a direct witness by State, Vera, in response to several questions on direct examination, testified that she did not know who beat Janis; that she had not identified Blaine and Tapio to the officers as the assailants; that she was not there when it happened because she was at Sharon's; and, that the fight did not result from Tapio's suspicions that Janis was fooling around with Tapio's girl friend, Ollie. Officer Blenner was recalled to the stand to impeach Vera's credibility and testified that

Vera said that both Tapio and Blaine beat "him" (Janis) with boards. Vera told Blenner that Blaine, Tapio and Janis were involved in the fight. Vera also said that Tapio thought Ollie was fooling around with Chris and that this was what originally started the fight.

While recognizing that impeachment by use of prior inconsistent statements is governed by our decision in *State v. Gage*, 302 N.W.2d 793 (S.D.1981), Blaine argues that three of the four factors set out in *Gage* were not met. In *Gage*, we adopted the Eighth Circuit's four-factor test for using prior inconsistent statements for impeachment. *See United States v. Rogers*, 549 F.2d 490, 495–97 (8th Cir.1976) *cert. denied* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Those factors are:

1. Inconsistency: The statements must be inconsistent. *Id.* at 495.
2. Relevancy: The inconsistency must "relate to a matter of sufficient relevancy that the prosecution's case will be adversely affected if the inconsistent testimony is allowed to stand." *Id.* at 496 (citation omitted).
3. Compliance with Rule 613 (SDCL 19–14–24 and 19–14–25): The prior statement must, on request, be shown or disclosed to opposing counsel, and "if extrinsic evidence is to be used to prove the prior statement, the witness must be afforded an opportunity to explain or deny it, and the opposing party must have an opportunity to interrogate the witness about it." *Id.* at 497.
4. Limiting instructions: The trial court "must adequately instruct the jury about the limited purpose for which the prior inconsistent statement is admitted." *Id.*

*Gage*, 302 N.W.2d at 798 (quoting *Rogers*, *supra*). It is Blaine's contention that the first, second and fourth factors were not met. We examine those factors seriatim.

INCONSISTENCY: The inconsistency between Vera's testimony and the Officer's report of her statements is so obvious as to be beyond dispute. Nor are we persuaded by Blaine's argument, advanced here, that

Vera was referring to Red Star as the "him" in her testimony. The record discloses that the prosecutor corrected Vera several times when she started speaking about Red Star and directed her attention back to the assault on Janis.

RELEVANCY: Blaine claims that nothing in Vera's testimony would have adversely affected State's case if Vera's testimony were allowed to stand. We disagree.

Vera was the moving force that engaged the police department in the case. She called them to the scene, pointed out the victims, and then identified the perpetrators. It would be disastrous to State's case to let her waltz into court and turn her back on her involvement unchallenged.

Blaine's theory of the case was that he, himself, did not bludgeon Janis and, therefore, was innocent of the charges. Without allowing State to impeach Vera's credibility, the jury would have received a distorted picture. This might have misled the jury into believing Vera's undisputed testimony, rejecting State's other evidence, and finding that Blaine was not involved with the beating of Janis.

Vera's testimony, standing alone and undisputed, could also have negated Lori's eyewitness testimony that Blaine beat Janis with a "stick." It was the bludgeoning upon the head of the victim which caused Janis' death. In fact, one of the alternative charges before the jury was the offense of killing by means of a dangerous weapon (SDCL 22–16–15(3)). If Vera's inconsistent statements were allowed to stand alone and the jury believed her as being credible, State's case would have been adversely affected. We find the impeaching evidence to be extremely relevant. *Gage, supra*.

LIMITING INSTRUCTION: Twice, while Blenner was testifying, the trial judge instructed the jury that Blenner's testimony was only allowed on the issue of Vera's credibility. Blaine now contends that the trial court failed to also instruct the jury, at that time, that her statement could not be used to prove the truth of the matter asserted. Blaine did not make any objection to the adequacy of the court's oral limiting instruction at that time.

Moreover, at the close of the case, the trial court gave Instruction 36, dealing with impeachment by prior inconsistent statement, which culminated in the following language: "[B]ut you must not consider any such prior statement as establishing the truth of any fact contained in that statement."

In light of the oral and written limiting instructions given to the jury, we believe that the jury was adequately instructed to only consider those statements as affecting credibility *and* not as substantive evidence. *O'Brien, supra; Gage, supra.* We must presume that the jury followed these limiting instructions. *State v. Weddell,* 410 N.W.2d 553 (S.D.1987); *State v. Reddington,* 80 S.D. 390, 125 N.W.2d 58 (1963).

Because issues 4, 5, 6, and 7 may or may not arise on the retrial, we decline to discuss them at this time.

We reverse and remand for a new trial.

SABERS and MILLER, JJ., concur.

WUEST, C.J., and HENDERSON, J., dissent.

WUEST, Chief Justice (dissenting).

The majority would have this case reversed and remanded on the grounds the trial court committed reversible error when it held certain involuntary statements made by Brings Plenty could be used against him on cross-examination if he took the witness stand and testified in a manner inconsistent with such involuntary statements. I have no reservations in holding the statements at issue were, in fact, involuntary. However, I firmly believe it is unwise to reverse and remand this case on the basis of this issue because Brings Plenty did not testify at trial and thus did not subject himself to cross-examination. Because of this fact, I believe this issue was not properly preserved on appeal. Hence, I respectfully dissent.

On appeal, the State argued by electing not to testify, Brings Plenty waived the issue of whether the trial court erred in holding his involuntary statements could be used against him on cross-examination. The majority opinion disposed of this argument by the State, declaring: "We are not willing, and do not hold, that a defendant waives a constitutional defect in taking a confession when he does not testify." I cannot agree with this holding.

The United States Supreme Court has held in *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) that a defendant may waive a constitutional defect in taking a confession if he does not testify. In *Portash,* a defendant was granted use immunity and testified before a grand jury. Later, he was charged with misconduct in office and extortion. During the trial of this matter, the trial court ruled that his grand jury testimony could be used to impeach his credibility if he testified. In rendering a decision as to whether the trial court erred in holding defendant's grand jury testimony could be used against him on cross-examination, the United States Supreme Court held it was not precluded from addressing this issue simply because the defendant did not testify. The majority opinion held the issue of whether a defendant must testify under such circumstances is a procedural question that is within the authority of the state court to decide. *See, Portash, supra,* 440 U.S. at 462, 99 S.Ct. at 1299, 59 L.Ed.2d at 512 (Powell, J., and Rehnquist, J. concurring). In *Portash,* the majority stated that "federal law does not insist that New Jersey was *wrong* in *not* requiring [defendant] to take the witness stand in order to raise his constitutional claim." *Id.,* 440 U.S. at 456, 99 S.Ct. at 1295, 59 L.Ed.2d at 508. (Emphasis added). This very statement indicates a state court *may* require a defendant to take the witness stand in order to raise a constitutional claim such as the one at issue. It also indicates a state court need not require a defendant to take the witness stand in order to raise such a constitutional claim. In essence, it is up to the state court to decide whether a defendant must take the witness stand in order to raise a constitutional claim such as the one presently at issue.

I now discuss the issue of whether this court should require a defendant to testify in order for such defendant to raise a claim of constitutional error regarding the allow-

ance of improper impeachment evidence. Initially, I note that this court has not dealt with this issue at great depth. In *State v. Swallow*, 405 N.W.2d 29 (S.D.1987) and *State v. Cody*, 323 N.W.2d 863 (S.D.1982), this court was presented with the above-mentioned issue. In both cases, we addressed the constitutional question although the defendant failed to testify. Our decision to address those constitutional issues, however, was not of great significance in those cases since the defendant's constitutional challenges were ultimately rejected in both cases. Hence, our decision to address the constitutional issues in *Cody* and in *Swallow* essentially had no bearing on the outcome of the case.

It is significant to note that in *Cody*, Justice Henderson, writing for the majority, referred to the case of *State v. Escamilla*, 195 Neb. 558, 239 N.W.2d 270 (1976), in evaluating the issue of whether defendant's due process rights were denied because the State's potential use of unconstitutionally obtained statements chilled his ability to testify. In *Escamilla*, the Nebraska Supreme Court dealt with an issue similar to the one presently at issue. The majority opinion in *Cody* noted the following statement in *Escamilla:* "Under such circumstances it is for the defendant to decide whether or not he should testify. He has not been deprived of his right to testify, but has voluntarily elected not to." *Cody, supra* at 869, citing *Escamilla, supra*, 239 N.W.2d at 271. This statement indicates that a defendant cannot refuse to testify and then later claim his due process rights were violated because his decision not to testify was due, in whole or in part, to the trial court's failure to suppress certain unconstitutionally obtained statements. In spite of this statement, we have addressed constitutional challenges such as the one at hand although the defendant failed to testify. *See Swallow, supra.* Having re-evaluated this issue in light of the unique facts presented in this case, I believe the better rule with respect to the issue now before us is to require the defendant to take the stand and appeal a subsequent conviction. If the defendant has failed to do so, we should conclude the

issue has not been properly preserved for appeal and thus we should decline to address the issue.

In support of my position I again refer to *Portash, supra.* In *Portash*, Justice Powell and Justice Rehnquist (now Chief Justice Rehnquist) concurred in writing, and indicated the proper way for a defendant to preserve an issue such as the one at hand is to take the stand and appeal a subsequent conviction. Specifically, these two Justices stated:

> [The State] insists that, because [defendant] did not take the witness stand, his immunized testimony was not used against him and he therefore cannot complain of a violation of his Fifth Amendment privilege. The preferred method for raising claims such as [defendant's] would be for the defendant to take the stand and appeal a subsequent conviction, if—following a claim of immunity— the prosecutor were allowed to use immunized testimony for impeachment. *Only in this way may the claim be presented to a reviewing court in a concrete factual context. Moreover, requiring that the claim be presented only by those who have taken the stand will prevent defendants with no real intention of testifying from creating artificial constitutional challenges to their convictions.*

*Portash, supra*, 440 U.S. at 462, 99 S.Ct. at 1299, 59 L.Ed.2d at 512 (Powell, J., and Rehnquist, J., concurring) (emphasis added). This rule was adopted by the United States Supreme Court in *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). In *Luce*, the majority stated:

> The preferred method for raising claims such as [petitioner's] would be for the defendant to take the stand and appeal a subsequent conviction ... Only in this way may the claim be presented to a reviewing court in a concrete factual context.

*Id.*, 469 U.S. at 43, 105 S.Ct. at 464, 83 L.Ed.2d at 448.

The reasoning set forth in these statements is very persuasive. A concrete fac-

tual context should be presented to this court before we rule on a constitutional issue. We should not base our opinions on mere conjecture. Also, in the present case, I find it highly unlikely that Brings Plenty would have testified if the trial court would have ruled his involuntary statements could *not* be used against him on cross-examination. There was a great deal of incriminating evidence presented against Brings Plenty at trial and subjecting himself to cross-examination would probably have been an unwise decision. Most importantly, and overlooked by the majority, is the fact Brings Plenty does not argue in his briefs he would have testified if the trial court had not made its ruling regarding impeachment. All of this leads me to believe Brings Plenty has simply created an artificial constitutional challenge to his conviction by asserting his due process rights were violated. This should be avoided and hence I believe, particularly in this case, a defendant should be required to take the witness stand in order to raise a constitutional claim such as the one now before this court.

It is also significant to point out that in *Portash*, Justice Blackmun and Chief Justice Burger dissented from the majority opinion, arguing that the Supreme Court should not have even addressed the defendant's constitutional claim because he failed to testify. In arguing this point, these Justices stated the following:

> But this claimed burden on the right to testify is too speculative to support the exercise of jurisdiction by this Court over the ultimate dispute concerning the use of immunized testimony. On this record, we cannot tell whether respondent would have taken the stand even had he obtained the ruling he sought from the trial court. The decision by a criminal defendant to testify is often the most important decision he faces in the trial, and it seldom turns on the resolution of one factor among many. Even had respondent taken the stand, there is no assurance he would have given inconsistent answers to questions.... Moreover, even had inconsistent answers been given, the trial court would have had to determine whether the answers were offered in response to relevant and material questions before it would have permitted impeachment. And even then, there is no certainty that the State actually would have sought to use the immunized materials to impeach respondent.

*Portash, supra,* 440 U.S. at 467, 99 S.Ct. at 1301, 59 L.Ed.2d at 515 (Blackmun, J., and Burger, C.J., dissenting). This excerpt elucidates several reasons why a defendant should be required to testify in order to raise a constitutional claim such as the one now before us. As noted in this excerpt, a defendant's decision not to testify seldom turns on one factor among many. This explains, to a certain extent, why some courts have stated that defendants presented with circumstances similar to those presented to Brings Plenty are not deprived of their constitutional right to testify, but have voluntarily elected not to. *See, Escamilla, supra; Cody, supra.*

The majority's decision to reverse and remand this case is based on pure conjecture. There is absolutely no indication Brings Plenty would have testified if the trial court would not have made the ruling in question. Further, it is likely on remand the defendant will again refuse to testify in spite of our holding the involuntary statements may not be used against him on cross-examination. In such case, it would be difficult to see what purpose the majority decision served other than to give Brings Plenty a new trial where plainly a new trial was not warranted. I readily admit the trial court erred in holding the involuntary statements could be used against the defendant on cross-examination. However, since the defendant failed to testify, I would hold he did not preserve the due process issue for appellate purposes.

HENDERSON, Justice (dissenting).

Once, many years ago, I read that it was universally held that each person in society should obtain that, under the law, be it good or evil, which he deserves; and, further, that it is unjust that he should obtain

a good, or be made to undergo an evil, which he does not deserve.

Under the majority decision, this Honorable Court has forsaken this universal conviction. Brings Plenty, termed "Blaine," has escaped that which he deserves: A lifetime sentence, without parole, to the State Penitentiary. By his intent and his act, he took another man's life. A jury convicted him, having heard all of the evidence.

Learned Hand once expressed: "We have to deal with words, and there is nothing more fluid than words." The majority opinion has word fluidity; however, it does not make good sense nor does it achieve a just result. Specifically, the majority writing simply fails to appreciate the constitutional stance of the United States Supreme Court as reflected in *Luce* and *Portash*. If that is not bad enough, it overlooks precedent in this Court, namely *Cody*.

Is it not true that precedent fosters more precedent? Accumulating—they become law and lawyers depend upon it. The public has a right to depend upon it, also. In what manner does footnote 2 bring about a positive good to the settled law of this State? It acts only as a sounding board for an acidulous dissent in a previous case which did not carry the day.

I am in accord with the Chief Justice's writing and believe, as does he, that the majority decision creates an artificial constitutional challenge to the murder conviction of Brings Plenty.

Therefore, I join in the Chief Justice's dissent.